## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUNLIGHT SAUNAS, INC.,     )
                        )
          **Plaintiff,**     )
                        )        **CIVIL ACTION**
**v.**                      )
                        )        **Case No. 04-2597**
SUNDANCE SAUNA, INC., et al.,     )
                        )
          **Defendants.**     )
                        )

## MEMORANDUM AND ORDER

Sunlight Saunas, Inc. brings suit against Sundance Sauna, Inc. and Brighton Sauna, Inc., alleging tortious interference with contract, tortious interference with prospective business relationships, trademark infringement, false advertising, false description, cybersquatting, injury to business reputation, unfair competition, business defamation, civil conspiracy, antitrust activity and other tortious and deceptive trade practices arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the state laws of California and Kansas.  This matter comes before the Court on Defendants' Dispositive *Daubert* Motion To Exclude Plaintiff's Expert (Doc. #185) filed on January 17, 2006 and Plaintiff's Motion To Strike Defendants' Purported Statement of Facts (Doc. #197) filed on February 6, 2006.  For reasons set forth below, the Court finds that defendants' motion should be sustained and that plaintiff's motion to strike should be overruled.

### Factual Background

Based on the briefs and exhibits filed by the parties on the current motions and the motions for summary judgment, the Court finds the following facts:

In January of 2000, Jason Jeffers started Sunlight Saunas, Inc. ("Sunlight"). In June of 2002, he brought in as investors his sister Connie and her fiancé Aaron Zack. Zack was plaintiff's chief executive officer ("CEO"). Jeffers was chief marketing officer from June of 2002 to January 10, 2005. Connie, who later became Mrs. Zack, has been director of sales since 2003.

Sunlight sells saunas and related products over the Internet and through trade shows, showrooms and distributors throughout the United States and abroad. The sauna business is seasonal and highly competitive, and plaintiff's products compete with those of Sundance Sauna, Inc. ("Sundance"), Brighton Sauna, Inc. ("Brighton") and Sauna by Airwall, among others.

In July of 2004, Jeffers claimed that Sauna by Airwall had spread "slander and lies" about plaintiff, and in August or September of 2004, Jeffers saw the Sauna by Airwall website. One image on the website showed one of plaintiff's sauna heaters cut in half, and revealed that it had an aluminum backplate. Another image showed that plaintiff's saunas contained veneer.

Shortly after Jeffers saw these images, on October 7, 2004, Preston Hall posted a website which included the following statements.

Sunlight Saunas Lies
Lie #1: True Ceramic Heaters
    Sunlight Saunas claim that their saunas offer ceramic infrared heaters.
The Truth
    Sunlight Sauna's heaters are made from steel rods and aluminum casing with pink paint. Aluminum can be incredibly toxic inside the body.
Lie #2: Veneer Free Construction
    Sunlight Saunas would have you believe that each of their saunas were 100% veneer free.
The Truth
    Veneer roof, Veneer "Fresh Air Vent" (doesn't this contradict their entire sales pitch about veneer free?). Not so state-of-the-art antenna.
Lie #3: No Safety Warnings
    Sunlight Saunas has no safety compliance.

2

The Truth

Ever wonder why they aren't UL, CSA, or ETL certified? Ask your home Insurance company about products with heaters operating at several hundred degrees that don't meet these standards. Infrared sauna Heaters [sic] operate between 300 and 600 degrees [F]ahrenheit. Can you imagine buying an oven that has not been certified to the minimum standards the USA has established for safety? Now imagine putting those oven heating elements inches from kiln dried wood without any safety certification. Sounds crazy but Sunlight as usual takes the shortcut to profit.

Lie #4: Lifetime Warranty

Sunlight Saunas offers a lifetime Warranty[.]

The Truth

Sunlight Saunas would have you believe they are the manufacturer, yet another lie. Do these models look familiar? Sunlight Saunas have changed manufacturers three times in four years. American Infrared Sauna has only been manufacturing since 2003. How can they promise a lifetime?

Lie #5

Sunlight Saunas presents a list of "exclusive" features. Claiming to be unique.

The Truth

Sunlight Saunas doesn't even manufacture their own saunas. Other company's [sic] offer the same products without the fraudulent claims.

Exhibit Hall #22 to Memorandum Of Law In Support Of Defendants' Dispositive *Daubert* Motion To Exclude Plaintiff's Expert ("Defendants' Memorandum") (Doc. #186). Hall created this website in concert with Matt Thomas, CEO of Sundance. The website originally included links to websites of plaintiff's competitors. Sundance directed Hall to remove such information, however, and on October 11, 2004, he did so. Hall removed the entire website on November 5, 2004, so it was active for slightly more than one month.

A handful of customers mentioned Hall's website to plaintiff. The record contains no evidence whether those customers purchased saunas or from whom.

Except for November of 2004, plaintiff did not meet any of its monthly sales goals for the period between October of 2004 and June of 2005. March is generally the biggest sales month of the year. By March, however, Zack had cancelled the credit card which plaintiff used to pay for one of its Internet accounts,

3

and as a result, plaintiff's Internet service was interrupted for about one week in March.[1]  Also in March,

plaintiff installed a new data base and phone system.  Zack attributed the lackluster performance in March to

lingering effects of Hall's website and defamation and interference by Sundance and Brighton.  According to

Lisa Zinnecker, plaintiff's sales manager, the new data base and phone system contributed to March not being

a good month.  Zinnecker testified that several other factors also contributed to plaintiff not meeting its sales

goals for April and May:

> I just felt that there was a shift in the market, where typically there might have been five true competitive companies, you know.  I think we were seeing a lot of the smaller types of cheaper saunas coming into play and people probably impulsively buying those cheaper saunas. . . . There is a shift I think with an increase of awareness of infrared.  There is also an opportunity for more businesses to take the opportunity.

L. Zinnecker Depo at 119:16 - 120:8, Exhibit 11 to Plaintiff's Response To Defendants' "Dispositive" Daubert

Motion To Exclude Plaintiff's Expert (Doc. #198) filed February 6, 2006.

On July 12, 2005, Sunlight filed suit against Jeffers, alleging that he had neglected to respond to inquiries

from customers and vendors, failed to pass on inquiries to the company, failed to operate as director of

marketing, and failed to contribute to plaintiff's day-to-day operation, causing a loss of potential business

opportunities.  Plaintiff sought to restrain Jeffers from interfering with its customers, employees and business

relationships.

On December 16, 2004, plaintiff filed this suit against Sauna by Airwall, Sundance and John Does 1-2.

On May 19, 2005, plaintiff added Brighton, Cobalt Multimedia, Inc. and Hall as defendants and removed John

Does 1-2 as defendants.  On November 2, 2005, the Court dismissed claims against and the counterclaims

---

[1]     The parties dispute how many marketing accounts were interrupted and for how long.  The Court construes these facts in the light most favorable to plaintiff.

by Sauna by Airwall.  On March 15, 2006, the Court dismissed plaintiff's claims against Cobalt Multimedia and Hall.  Accordingly, plaintiff's remaining claims are against Sundance and Brighton.

The pretrial order sets forth the following claims: tortious interference with contract (Count I); tortious interference with prospective business relationship (Count II); trademark infringement, dilution and unfair competition (Count III); defamation (Count IV); injurious falsehood (Count VI); civil conspiracy (Counts VII and VIII); prima facie tort (Count IX); unfair business practices under Cal. Bus. & Prof. Code § 17200 (Count XII); false advertising under Cal. Bus. & Prof. Code § 17500 (Count XIII); false advertising in violation of Section 43(a)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (Count XIV); false description in violation of Section 43(a)(A) of the Lanham Act, 15 U.S.C. § 1125(a) (Count XV); cybersquatting (Count XVI); and anti-trust activity in violation of the Sherman Act, 15 U.S.C. § 1 (Count XVII).

Plaintiff seeks economic damages; damages for lost good will, injury to reputation and dilution of its trade name or mark; statutory damages pursuant to the Anticybersquatting Act, 15 U.S.C. §§ 1125(d) and 1117; attorneys' fees; treble damages and costs; and punitive damages.

In June of 2005, defendants deposed Zack in this case.  Zack testified that he had not calculated damages, that lost sales were not his expertise, and that he did not know plaintiff's market share, the number of infrared sauna manufacturers in North America, or the relative market shares of plaintiff and its competitors.[2] No third party industry reporting of sauna sales is available.  Low-cost Chinese sauna manufacturers started to compete in the sauna market in the first part of 2005.  Leo Hernandez, an employee of Sauna by Airwall, testified that new competitors from overseas were "popping up all over the place."  Hernandez Depo at 90:8-20, Exhibit to Defendants' Memorandum (Doc. #186).

---

[2]        This case apparently concerns far infrared saunas, which the parties do not define.

Since 2001-2002, plaintiff's forecasted and actual sales have been as follows:

| Fiscal Year | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
|---|---|---|---|---|
| Forecasted Sales | 440 | 750 | 1170 | 4775 |
| Actual Sales | 443 | 803 | 1906 | 3588 |
| Per cent Error | +1% | +11% | +63% | - 25% |
| Per cent Sales Growth | -- | 81% | 137% | 88% |

See Exhibit 12 to Plaintiff's Response In Opposition (Doc. #198).  Jeffers testified that because plaintiff

doubled its sales in 2002-03, it assumed that it would double its sales every year.  According to Zack,

however, plaintiff used the following method to project annual sales for each year:

> The annual sales projections are determined, in part, by reviewing . . . documents, including but not limited to financial documents, previous years' sales documents, and marketing documents. * * * * The annual sales projections are also based on information . . . including but not limited to . . . various market factors, competitors' information, and other information that may or may not affect Sunlight Saunas' upcoming sales. The finalized annual sales projections are thereafter determined by . . . taking the number of sales people at Sunlight Saunas, its distributors (domestic and international), and multiplying each of them by an appropriately arrived-at forecasted number of units sold per month.  In the past, a slight adjustment has been applied to the monthly unit sales number in an effort to account for historic seasonality in our sales figures.

Declaration Of Aaron M. Zack, Exhibit 1 to Plaintiff's Response In Opposition (Doc. #198).  In making its

forecast for 2004-05, plaintiff anticipated increased competition during 2005.  Id. at ¶ 35.

Zack testified that plaintiff's gross sales for 2004 saunas ranged between $5 to $7 million, as contrasted

with 2003, which he estimated to be in the range of $2.5 to $4 million.  Despite this growth, he claimed that

Hall's website had "definitely impacted" plaintiff's business, A. Zack Depo (6/29/05) at 101:21-24, Exhibit to

Defendants' Memorandum (Doc. #186), and that plaintiff's growth in sales in 2004-2005 should have been

far superior to what it was.

6

On August 15, 2005, Charles E. Finch, plaintiff's expert witness, submitted a report on damages. Finch is a principal and practice leader for economic advisory services in the Kansas City office of Grant Thornton, LLP, an international accounting and consulting firm. Finch is not a certified public accountant, but he has an M.B.A. in Finance and a Masters in Economics. Since 1992, Finch has primarily provided expert testimony and economic consulting and served as adjunct instructor of economics, finance and quantitative analysis in the M.B.A. program at Avila University. He has provided expert testimony in at least 22 cases.[3]

Finch's report purports to calculate lost profits which plaintiff sustained on account of defendants' "false or misleading claims and representations relating to the quality, safety, and characteristics of Sunlight and its saunas." Exhibit A to Defendants' Memorandum (Doc. #186). In preparing his report, Finch assumed that (1) the allegations of plaintiff's second amended complaint are true; (2) plaintiff's sales projections from October of 2004 through June of 2005 are valid; (3) from October of 2004 through June of 2005, plaintiff would have sold more saunas than it projected because in the past, actual sales had exceeded projections;[4] and (4) any failure to meet projections resulted from defendants' conduct. Based on these assumptions, Finch used *projected* sales for October of 2004 through June of 2005 as a "base line" against which he compared actual sales to quantify damages. To calculate damages, Finch first excluded all data for November of 2004, the

---

[3]       Finch also has provided continuing legal education seminars to attorneys on environmental issues, understanding financial statements, valuing business and loss claims, statistics in litigation, and the costs and benefits of arbitration.

[4]       Finch's report adopted management's indication that "prior to the damage period, Sunlight had, since its inception in July 2002, consistently approximated or exceeded its monthly projected unit sales" and that "no industry or economic events or trends . . . would have led to the magnitude of decline in unit sales experienced." Exhibit A to Defendants' Memorandum (Doc. #186).

single month in which plaintiff's monthly sales exceeded its sales forecast.[5]  He then calculated lost unit sales

per month, as follows:

> Lost unit sales per month for the period October 2004 through June 2005 were calculated by
> subtracting the actual unit sales, adjusted for cancellations, from the forecasted unit sales for
> that month.

Exhibit A to Defendants' Memorandum (Doc. #186).  After calculating lost sales for October and December

of 2004, and January through June of 2005, Finch determined lost profits based on "the lost revenue resulting

from the sale of the various models of sauna products and the actual cost to Sunlight to purchase the various

models of the sauna products."  Id.  Taking into account the costs which plaintiff would have incurred in making

the lost sales, Finch concluded that plaintiff had suffered lost profits of $226,986 for 2004, and $1,060,228

for 2005 through June 30, 2005, for aggregate lost profits of $1,287,214.[6]

Defendants hired Dr. Christopher C. Pflaum, an economist, to examine Finch's expert report.  In

Pflaum's opinion, a knowledgeable economist would not view plaintiff's forecasts as an accurate basis for

determining lost sales.  Pflaum noted that Finch did not account for (1) changing market conditions, which

---

[5]      Finch explained this decision as follows:

The month of November 2004 has been excluded from the damage calculation as the actual
number of units sold was in excess of the forecasted number of units to be sold in that month.
Management indicated that in November 2004, a new international distributor placed an initial
order for 100 Solo saunas and 450 solo pads.  Absent those orders, the month of November
2004 would have fallen below its forecasted number of units.

Exhibit A to Defendants' Memorandum (Doc. #186).

[6]      Finch later reduced this figure by approximately $300,000 because he had mistakenly
multiplied a variable for cost of sales against gross profit instead of gross sales.  He then projected plaintiff's
lost profits to be $942,000.  Finch's calculations do not address the Lanham Act and Sherman Act claims, and
Finch does not consider himself an antitrust expert.

included a major increase in saunas imported from Asia after December 27, 2004;[7] (2)  plaintiff's operational

problems, including Jeffers' departure from Sunlight on January 10, 2005, interruption of Internet leads, and

changes in the telephone and data base systems during March of 2005; or (3) disparagement by Sauna by

Airwall.

On January, 17, 2005, defendants filed <u>Defendants' Dispositive *Daubert* Motion To Exclude Plaintiff's</u>

<u>Expert</u> (Doc. #185).   <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).   On

February 6, 2006, plaintiff filed a motion to strike certain statements of facts in defendants' motion.  <u>See</u> Doc.

#197.  The Court first addresses plaintiff's motion to strike.

**<u>Analysis</u>**

**I.      Motion To Strike**

Pursuant to Rule 12(f), Fed. R. Civ. P., and the Local Rules for the District of Kansas, plaintiff moves

to strike 26 fact statements from the brief in support of defendants' <u>Daubert</u> motion.  <u>See</u> <u>Memorandum Of</u>

<u>Law In Support Of Defendants' Dispositive *Daubert* Motion To Exclude Plaintiff's Expert</u> (Doc. #186) filed

January 17, 2006.  Plaintiff contends that the facts are not supported by defendants' record citations.

Defendants argue that the Rule 12(f) motion is inappropriate and without merit.

Rule 12(f), Fed. R. Civ. P. provides as follows:

Upon motion made by a party before responding to a pleading or, if no responsive pleading
is permitted by these Rules, upon motion made by a party within 20 days after the service of
the pleading upon the party or upon the Court's own initiative at any time, the Court may order
stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent,

---

[7]        On December 27, 2004, Lakoda, Inc. apparently requested a tariff clarification for four types
of infrared saunas imported from China – the first such request.  On March 9, 2005, U.S. Customs and Border
Protection apparently classified such saunas as "prefabricated buildings of wood," precipitating a major increase
in the importation of far infrared saunas.

or scandalous matter.

A court will usually deny a motion to strike unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.  <u>Nwakpuda v. Falley's, Inc.</u>, 14 F. Supp.2d 1213, 1215 (D. Kan. 1998).  A Rule 12(f) motion is not the appropriate method to challenge the factual support for an allegation.  <u>Id.</u>

Rule 12(f) authorizes the Court to strike material from pleadings.  A brief in support of a <u>Daubert</u> motion is not a pleading.  <u>See</u> Fed. R. Civ. P. 7(a) (pleadings include complaint, answer, reply to counterclaim, answer to counterclaim, third-party complaint and third-party answer); <u>Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.</u>, 230 F.R.D. 657, 660 (D.N.M. 2005) (complaint, answer and reply constitute pleadings; motions and other papers not pleadings).  The Court overrules plaintiff's motion to strike for substantially the reasons set forth in <u>Defendants' Response In Opposition To Plaintiff's Motion To Strike Defendants' Purported Statements Of Fact</u> (Doc. #216) filed March 10, 2006.  Obviously, the Court will not consider facts which are unsupported by the record.

## II.   **Defendants' *Daubert* Motion**

Defendants argue that Finch is not qualified to render an expert opinion and that he has relied on unvalidated, unsupported and unreliable projections, and seek to exclude his testimony under Federal Rules of Evidence 403 and 702 and <u>Daubert</u>, 509 U.S. at 579.  Under Fed. R. Evid. 702, the trial court must act as a gatekeeper and determine at the outset, pursuant to Fed. R. Evid. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>Daubert</u>, 509 U.S. at 592.  This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be

applied to the facts in issue.  Id.  Fed. R. Evid. 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision whether to admit or exclude expert testimony is committed to the sound discretion of the district court.  Latshaw v. Mt. Carmel Hosp., 53 F. Supp.2d 1133, 1136 (D. Kan. 1999).

"[W]hen the proffered expert relies on some principle or methodology," the trial court should consider a nonexhaustive list of nondispositive factors in determining whether the reasoning or methodology is scientifically valid or reliable: "(1) Can it and has it been tested?; (2) Has it been subjected to peer review and publication?; (3) Does it have a known or potential rate of error?; and (4) Has it attained general acceptance in the relevant scientific community?" Compton v. Subaru of Am., Inc., 82 F.3d 1513, 1518 (10th Cir. 1996). Since Daubert, the courts have continued to apply a traditional Rule 702 analysis except in cases involving unique, untested or controversial methodologies or techniques.  Id. at 1519.  Application of the four factors set out in Daubert "is unwarranted in cases where expert testimony is based solely on experience or training."  Id. at 1518.

As part of the pretrial evaluation, the trial court also must determine whether the expert opinion is "based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation."  Kieffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting Jones v. Otis Elevator Co., 861 F.2d 655, 662 (11th Cir. 1988)).  The touchstone of admissibility is helpfulness to the trier of fact.  Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991).

Defendants first argue that Finch is not qualified to render an opinion.  Specifically, defendants contend that he did not consider any market data or assess relevant economic factors related to the sauna market.

11

Plaintiff responds that defendants have not challenged Finch's credentials, and that they instead focus on the reliability of his opinion. The Court agrees and considers defendants' arguments in the later context – not as a challenge to his credentials.

Defendants argue that Finch's methodology is flawed because (1) despite the historical inaccuracy of plaintiff's sales projections, Finch based his conclusions on the assumption that plaintiff had accurately projected its sales for October of 2004 through June of 2005; (2) Zack could not account for how plaintiff reached its sales projections; (3) Finch did not take into account significant factors, aside from defendants' conduct, which could have explained the decline in the growth of plaintiff's sales; (4) Finch accepted Zack's conclusion that industry and economic events and trends could not explain the decline in plaintiff's growth from October of 2004 through June of 2005, when in fact the competition increased and plaintiff experienced internal turmoil during that time; and (5) Finch did not consider the wrongful conduct of Sauna by Airwall.

Defendants' criticisms of Finch's methodology are well taken. Finch's entire damage calculation is based on his underlying assumptions regarding plaintiff's forecast of sales. Finch did not independently analyze the projections, and plaintiff provides no coherent explanation how it arrived at the projections. Plaintiff's vague statements that it took into account "various analyses" and "numerous and various documents" are conclusory, evasive and anything but expert. Nothing in the record suggests that a reasonable economist would employ such a methodology to forecast sales, or assume that such a methodology, when conducted by others, is accurate. The record contains no data on market share, no market research and no evidence that absent wrongful conduct by defendants, plaintiff's sales would have increased from 1,906 to 4,775 between July of 2004 and June of 2005. On this record, plaintiff's projections are more sleight of hand than consistent with generally accepted economic methodology. No reasonable jury would accept them as valid predictors of

actual sales and Finch's opinions, which assume that the projections are valid, would not assist the trier of fact. See, e.g., JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc., No. Civ.A. 970CV-0652, 1998 WL 175888, at *7 (E.D. Pa. Apr. 15, 1998) (expert had no independent verification of reasonableness of sales projections).

　　　　Although the record contains undisputed evidence regarding increased competition from Chinese manufacturers, starting in January of 2005, it is devoid of evidence that a reasonable economist would assume that such increased competition did not impact plaintiff's sales during the relevant period. See Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415-16 (7th Cir. 1992) (expert should separate from damages for defendant's alleged misconduct those damages which result from entry of powerful competitor). Also, Finch does not consider whether (or how) Jeffers' absence affected sales, or the loss of Internet leads during March (the historically busiest month of the year). Finch offers no explanation why, under generally accepted economic methodology, he would assume that these issues did not affect sales. In addition, he does not consider whether conduct of Sauna by Airwall impacted plaintiff's sales or accounted for a percentage of lost sales. Because Finch attributes all lost profits to defendants without considering increased competition in the market, other market conditions or alleged wrongdoing of other competitors, Finch's testimony would not assist the jury in determining the fact or the amount of damages. See First Savings Bank, F.S.B v. U.S. Bancorp, 117 F. Supp.2d 1078, 1085 (D. Kan. 2000) (improper attribution of all losses to defendants' illegal acts, despite presence of other factors, infects basic methodology); In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1507 (D. Kan. 1995) (prudent economist must account for differences and would perform minimum regression analysis when comparing price before relevant period to prices during damage period); see also Bazemore v. Friday, 478 U.S. 385, 400 n.10 (1986) (while failure to include variables normally will affect probativeness of analysis, some regressions may be so incomplete as to be irrelevant).

13

Finally, Finch offers no accepted economic methodology which can justify his decision to exclude all data for November of 2004, the one month in which actual sales exceeded plaintiff's projections and the one month which most closely follows the posting of Hall's defamatory website. By way of facial explanation, Finch states that a new international distributor placed a large initial order. Nothing in the record, however, suggests that in calculating lost profits, standard economic methodology excludes initial large orders from new international distributors. In addition, nothing in plaintiff's forecast methodology suggests that it disregards initial sales to new distributors. On this record, Finch's methodology is simply a house of cards. It may be mathematically accurate, but he has not shown that it is sound or reliable, or generally accepted in the field of economics. Finch's damage calculations are legally unreliable and therefore inadmissible under Rule 702. Any probative value of his opinion on damages is substantially outweighed by the danger of misleading the jury and unfair prejudice resulting from his unsupported assumptions and failure to consider other circumstances. See Fed. R. Civ. P. 403.

Defendants construe their motion to exclude expert testimony as dispositive. Plaintiff disagrees, arguing that it seeks relief other than the damages calculated by Finch. The Court will address these matters in its ruling on defendants' motion for summary judgment.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion To Strike Defendants' Purported Statement of Facts (Doc. #197) filed February 6, 2006 be and hereby is **OVERRULED**.

**IT IS FURTHERED ORDERED** that Defendants' Dispositive *Daubert* Motion To Exclude Plaintiff's Expert (Doc. #185) filed January 17, 2006 be and hereby is **SUSTAINED**.

Dated this 5th day of April, 2006 at Kansas City, Kansas.

s/  Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

14