# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUNLIGHT SAUNAS, INC.,          )
                                )
             Plaintiff,        )
                                )       **CIVIL ACTION**
v.                           )
                                )       **No. 04-2597-KHV**
SUNDANCE SAUNA, INC. and    )
BRIGHTON SAUNA, INC.        )
                                )
             Defendants.    )
_____)

## MEMORANDUM AND ORDER

Sunlight Saunas, Inc. brings suit against Sundance Sauna, Inc. and Brighton Sauna, Inc., alleging tortious interference with contract, tortious interference with prospective business relationship, trademark infringement, false advertising, false description, cybersquatting, injury to business reputation, unfair competition, business defamation, civil conspiracy, antitrust activity and other tortious or deceptive trade practices arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the state laws of California and Kansas. This matter comes before the Court on Defendants' Motion For Summary Judgment (Doc. #188) and Defendant Brighton's Motion For Summary Judgment (Doc. #194), both filed January 20, 2006. For reasons set forth below, the Court finds that defendants' joint motion should be sustained in part and that Brighton's motion should be overruled.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

2

**Factual Background**

The following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.[1]

The Parties

In January of 2000, Jason Jeffers started Sunlight Saunas.  In September of 2001, he incorporated Sunlight and relocated its principal place of business from St. Louis, Missouri to Santa Cruz, California.  While in California, Jeffers met Matt Thomas, a sauna salesman, and they decided to work together at Sunlight. Thomas resigned in June of 2002, and Jeffers brought in as investors his sister Connie and her fiancé Aaron Zack.  Beginning in June of 2002, Zack was Sunlight's chief executive officer and Jeffers was chief marketing officer.  In July of 2002, Sunlight moved its principal place of business to Cincinnati, Ohio.  In March of 2004, it relocated to Lenexa, Kansas.  Connie, later Connie Zack, has been director of sales since 2003.  Jeffers left Sunlight on January 10, 2005.[2]

When Thomas left Sunlight in June of 2002, he incorporated Sundance Sauna, Inc. in California.  Its principal of business is in San Diego.  Sundance hired Cobalt Multimedia, Inc., a Washington corporation owned by Preston Hall, to develop, host and maintain a website (www.sundancesauna.com) to sell saunas over

---

[1]    The Court has made every effort to state the facts and omit the arguments which are interlaced with them. Defendants have objected to a number of plaintiff's exhibits as hearsay and hearsay within hearsay. Under Rule 801(d)(2), Fed. R. Evid., an admission by a party opponent is not hearsay.  Many of defendants' objections are directed toward e-mail exchanges between defendants, and the Court includes them as uncontroverted facts.  Where the Court concludes that information is inadmissible, it omits that information from the statement of facts.

[2]    Aaron Zack testified that Jeffers left for personal reasons.  Jeffers testified that he left because Zack had purchased a $75,000 Range Rover in his own name from company funds, Jeffers Depo at 135:5-22, and the Zacks were emotionally abusive to him, id. at 138:4-22.

the internet.  Sundance has employed Thomas, Dan Murdock, April Laughlin, Dave Cole and Akara Moser.[3]

Hall is a shareholder of Sundance.  Thomas has sole operational and supervisory authority with respect to

Sundance advertising, marketing, promotion and sales.

From May through October of 2004, Thomas sought investors and business partners, including

manufacturers, to start up a second company, Brighton Saunas, Inc.  Brighton incorporated in Nevada on

July 1, 2004, and maintains its principal place of business in La Jolla, California.[4]  From July of 2004 to

February of 2005, Brighton developed saunas and sauna products and conducted product testing.  Brighton

started operations in February or March of 2005, and its website became active in February of 2005.  Before

February of 2005, owners and employees of Brighton used their e-mail addresses and accounts with Sundance

and Cobalt Multimedia to conduct business for Brighton. Since its incorporation, however, Brighton has been

listed in the telephone directory and has had an answering service.

Thomas is president of Brighton, and Darcie Thomas is secretary.[5]  Brighton has employed Thomas,

Murdock, Laughlin and Moser – all of whom work for Sundance as well – and Ken Lund and Darcie Thomas.

When Brighton started, it and Sundance were "companies in the same office" with "basically the same

employees."  Laughlin Depo at 30:8-19, Exhibit 35 to Plaintiff's Memorandum In Opposition (Doc. #200).

As at Sundance, Thomas has sole operational and supervisory authority with respect to Brighton advertising,

---

[3]        Akara Moser is also known as Ursula Moser.

[4]        Plaintiff has filed exhibits from the Better Business Bureau website which state that Brighton has been in business since April 1, 2004 and that Brighton uses "Sundance Sauna Inc." as an additional business name.  The Better Business Bureau website also indicates that as of April 13, 2005, Brighton had been in business for at least 12 months.  Defendants object that these statements are hearsay within hearsay.  The Court agrees and disregards them.

[5]        The record does not reveal whether Darcie Thomas is related to Matt Thomas.

4

marketing, promotion and sales.  Hall is a shareholder of Brighton.  Brighton hired his company, Cobalt

Multimedia, to develop, host and maintain its Internet website (www.brightonsauna.com), and Hall registered

Brighton's domain name in April of 2004.[6]

Sunlight Products

Sunlight sells personal saunas and other products over the Internet and through trade shows,

showrooms and distributors throughout the United States and abroad.  The sauna business is highly competitive

and seasonal, and its products compete with those of Sundance and Brighton.  Consumers base their sauna-

purchasing decisions on price, appearance, product safety, quality of construction, heater efficiency and

effectiveness and existence of a warranty.

Sunlight has affixed the mark "SUNLIGHT SAUNAS" to its saunas and other products.  From 2000

through February of 2001, Sunlight sold Healthmate saunas manufactured by PLH Products.  In August

of 2000, Jeffers launched a website (www.sunlightsaunas.com) to promote Healthmate products.  Jeffers relied

on the internet for 95 to 98 per cent of sales.  In March of 2001, Jeffers quit selling Healthmate saunas because

website sales encroached on the territories of other Healthmate dealers and he did not want to take down his

website.

From March through August of 2001, Sunlight distributed saunas for Saunas by Airwall, Inc.

Around August of 2001, Sunlight began selling saunas manufactured by Soft Heat, Inc.  Soft Heat also

manufactures saunas for Sundance and for a time, plaintiff, Sundance and Sauna by Airwall all sold saunas

manufactured by Soft Heat.  Sunlight stopped promoting Soft Heat saunas on its website in July of 2003, but

---

[6]         A domain name is "any alphanumeric designation which is registered with or assigned by any
domain name registrar, domain name registry . . . as part of an electronic address on the Internet." 15 U.S.C.
§ 1127.  Essentially, it is the website address.

it continued to sell remaining inventory for about six months.   Jeffers testified that Sunlight changed manufacturers for the following reasons:

> we were simply not receiving the customer service that we were requesting from the factory . . . and . . . it was becoming very, very hard for us to compete with Airwall and Sundance because essentially we were all selling the same product over the Internet, just minor – minor changes and so it was – it really became a bloodbath . . . .   And so in order for us to, you know, increase our revenues and increase our profit, it just made more business sense for us to separate ourselves from Soft Heat and go with another factory so that we could be distinguishable.

Jeffers Depo at 29:9-23, Defendants' Memorandum (Doc. #193).  Zack agreed that Sunlight changed for numerous reasons: "Number one, pricing; number two, the quality of the product; three, ethical decisions that we didn't feel were in line with our core of values of Sunlight Saunas."  A. Zack 6/29/05 Depo at 18:1-9, Exhibit 1 to Plaintiff's Memorandum In Opposition (Doc. #200).

In July of 2003, Sunlight began selling saunas manufactured by American Infrared Sauna, Inc. ("AIS").  Sunlight sold AIS saunas under two names: the Ra Class, which contains cedar wood, and the Phoenix Class, which contains basswood.  Sunlight offered a manufacturer's warranty, but no warranty of its own.  To launch the AIS saunas, Sunlight created a brochure and printed 10,000 copies.  The brochures contained the following statements:

- Inside the Ra's stylish cabin, you'll bask in the pure radiant heat of our patented Quantum Wave Technology™ far-infrared heaters, for a penetrating, detoxifying sweat unlike any other.

- Every Ra-Class sauna embraces the leadership of Sunlight innovations such as Quantum Wave Technology™ far-infrared heaters with remote control activation and our veneer-free cabinetry with solid wood, non-toxic framework.

- Every electrical wire is coated with steel for EMF radiation shielding and fire-hazard protection.

- We would not settle until 100% of the exposed wood was made from pure bass, the

> wood of choice for beekeepers because of its tannin-free, hypoallergenic properties.
>
> •  We also did away with the plywood which omits [sic] toxic formaldehyde.
>
> •  We called it *Quantum Wave Technology*.  Then we patented it.
>
> •  Some manufacturers use thin veneer sheets instead of the good stuff.  At Sunlight, we employ beautiful tongue and groove wood to the entire sauna, including the ceiling, floor, back wall and benches.

Jeffers #10 to Defendants' Memorandum (Doc. #193).  Sunlight's website contained a portable document format (PDF) version of the brochure and when customers requested a brochure, it e-mailed them a link to the web page.  At some point, the website contained a chart which compared Sunlight saunas with those of other companies.  The chart stated that the cabinetry in Sunlight products had "thick tongue and groove" while the cabinetry of other companies had "thin, toxic veneer sheets."  The website also stated that Sunlight heaters were "pure ceramic."

Sunlight saunas were not listed by Underwriters Laboratory ("UL"), the Canadian Standards Association ("CSA") or Electrical Tests Labs ("ETL"), and Sunlight did not advertise that its products carried such certifications.  AIS, however, completed a "Test And Inspection Summary" which stated that "according to testing and inspection . . . the [Phoenix Series saunas] are in compliance with the 240V electrical compatibility requirements."  Exhibit 15 to Plaintiff's Memorandum In Opposition (Doc. #200).

The Sunlight website included a statement that it was "very proud to be an Infrared Sauna manufacturer" and that it offered sauna kits of a "distinctive look and design with cutting edge therapeutic technologies that provide numerous holistic health benefits."  With regard to the claim that Sunlight was a sauna "manufacturer," Zack explained as follows:

> A manufacturer can mean different things.  Different organizations will consider us a manufacturer because we design our own saunas and we private label.  So there are aspects

> to Sunlight Saunas that would characterize us as a manufacturer, although we never claimed
> to build our own saunas.

A. Zack 6/29/05 Depo at 65:13-20. Jeffers testified that Sunlight was not a manufacturer and that if its website

claimed that it was a manufacturer, that statement would be incorrect. Jeffers Depo at 209:11 and 211:9.

On the Sauna by Airwall website, in August or September of 2004, Jeffers saw an image of what

appeared to be a Sunlight heater cut in half, and the image revealed that the heater had an aluminum back plate.

Sunlight had been unaware of the aluminum back plate and Jeffers rewrote part of the Sunlight website to

discuss the aluminum component of the heaters and address claims that they caused sauna users to be infiltrated

with toxic levels of aluminum.

Sunlight employed Chris Zinnecker as a customer service agent to resolve warranty claims. Zinnecker

determined that wires to the AIS sauna stereos and from the keypad to the power supply were not fully housed

in steel conduit and could short out. In August or September of 2004, Zinnecker also received an e-mail from

a customer who stated that he believed plywood had been used in his sauna. In October or November of

2004, Sunlight also learned that the saunas contained plywood or veneer. Sunlight subsequently changed the

statements about veneer on its website and in its brochures.

Zack testified that if customers reported hearing negative things about Sunlight, employees should

inform Connie Zack. According to Zack, Sunlight heard that Sauna by Airwall and Sundance had made

negative comments. As to negative statements by other competitors, Zack stated,

> I'm sure that it has happened before. Off the top of my mind I can't think of it. We have a
> pretty good reputation with everyone else in the industry. Most of the comments came from
> Soft Heat, I guess would be another one, Sauna by Airwall, and Sundance Brighton.

 A. Zack 8/25/05 Depo at 119: 25 to 120:8.

AIS marketed a sauna which it manufactured under its own trade name, Cedrus Saunas. Cedrus

8

saunas differ from Sunlight saunas in window shape, wood type, availability of basswood on certain portions of the sauna, design plate and location of the compact disc player.

Competition From Sundance And Brighton

Beginning in July of 2003, if not earlier, Sundance and Brighton engaged in a series of communications which eventually gave rise to this lawsuit. On July 17, 2003, Hall sent Thomas an e-mail which included Sunlight pricing and stated that "[t]hey are beating us in features and price on these things." Exhibit 81 to Plaintiff's Memorandum In Opposition (Doc. #200).[7] Six months later, on January 23, 2004, Thomas sent Hall an e-mail which stated in part as follows:

> We ended up getting that sale that called you Preston. . . . It's not a great deal but we did take it from Sunlight at THEIR established price, which was way below ours, almost $500- (or $300- if we threw in shipping). . . .
>
> Isn't it going to be fun to email Sunlight, "Now that you have been fired from Soft Heat, as was inevitable, the copyrighted pictures you stole will do you no good. Better luck next time with your marketing plan. We will be in Sunny Santa Cruz relaxing or counting our money if you e v e r   n e e d   t o   g e t   i n   t o u c h .   A l s o , FUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUCCCCCCCCCCCCCCC CCCCCCCCCCCCCCCCCCCCCCKKKKKKKKKKKKKKKKKKKKKKKKKK K K K K K K K K K K K K K K K K K K YOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOUUUUUUUUUUUUU UUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUUU."
>
> And if they don't get fired . . . I'll just say it's better for them that they get fired because I will devote unbelievable resources to dissolve them. Alright then, back to work.

Exhibit 67 to Plaintiff's Memorandum In Opposition (Doc. #200).

On February 18, 2004, Thomas sent e-mail to Hall, Cole (a Sundance employee) and Laughlin (an

---

[7]   As noted, Hall owns Cobalt Multimedia and is a shareholder in Sundance and Brighton. Thomas is shareholder and CEO of both Sundance and Brighton. From the record, the Court cannot discern when Thomas is acting on behalf of Sundance and/or Brighton, and when Hall is acting on behalf of Cobalt Multimedia, Sundance and/or Brighton.

employee of both Sundance and Brighton) which stated as follows:

> Let's start referring to the Sunlight "As long as you own it" warranty as the "As long as their manufacturer stays in business" warranty.

> This will be a fun way to lead customers into the pitch about how Sunlight has been all over the country the last few years, going through 4 different manufacturers, without sounding negative.

Exhibit 36 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).[8]  The following day, on February 19, 2004,

Laughlin sent an e-mail to dave@sundance-sauna.com (presumably fellow Sundance employee Dave Cole)

which stated as follows:[9]

> American Infrared Sauna Company, Inc is marketing under the name Cedrus Sauna. Bookmark this site should use [sic] need to use it in a sales situation.  Sunlight is apparently feeling the sting of our pitch and not only trying to retaliate by bad mouthing us but by also claiming they changed manufacturers because they weren't happy and decided they were going to start manufacturing themselves.  What a joke.  If it comes down to it, send people this link with a little note stating, "Look familiar?"

> Or, you can also ask them why their factory address has "upstairs" (where Aaron lives) and "downstairs" (where Jason lives) listed.  I would use this one very selectively if you know what I mean . . .

> Sunlight has thrown all their cards on the table and they definitely have impacted the industry with their marketing.  We on the other hand have held almost all our cards.  That is why we are having such great success in the sales battles with them.  They have no where to go.  Now they know the one card we've played.  Now they are trying to bluff.  We will simply play another card.  We've got a whole deck to go and they are hanging on to the suit they played.

> I want to take our responses to a new sophisticated level that doesn't warn people to stay away from them, but makes fun of them with facts to back it up.  They will continue to bad mouth us which will only make them look bad.  Remember to ask customers "Don't you think it's sad when a company has to bad mouth another one to try and sell their product?  You

---

[8]     Laughlin testified that she "probably at some point" used this sales pitch.  Laughlin Depo at 74:10.

[9]     Sunlight alleges that Thomas actually sent this e-mail but "April" appears in the "From:" line of the e-mail.

would think they would have some confidence in what they are selling but apparently they don't."

Exhibit 79 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).

On May 12, 2004, Sunlight sent a "secret shopper" – a private investigator who was posing as a potential customer – to communicate with defendants.  Sunlight apparently videotaped the interaction and later had the conversation transcribed.  The sales representative, who turned out to be Thomas, discussed a new product with the secret shopper, as follows:

> The other thing that you may be interested in is we've got some new product that will be coming out in about 6 months.  We do have some demos available now, but that will be coming out in about 6 months that might be real appealing to your clientele.  It's going to have some pretty radically different features and really be geared towards, you know, that type of clientele, so what we could do, you know, if you wanted to get going on the product is we could just set it up where – figure something out, you know.[10]

Exhibit 24 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200) at 11:7-16.

On July 9, 2004, Don Metcalfe, general manager of Sauna by Airwall, wrote Jeffers about the comparison chart which Sunlight had posted on its website.  Metcalfe stated that the chart was incorrect and included "blatant slanderous supposed truths" to "detour" consumers from purchasing a sauna from Sauna By Airwall.  Exhibit 5 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).  Metcalfe requested that Sunlight "cease and desist in these false statements" and stated that it would take appropriate legal action if necessary.  <u>Id.</u>  On July 16, 2004, Jeffers responded as follows:

---

[10]     The transcript is not offered for the truth of the matter asserted, but to demonstrate that Thomas was acting on behalf of Brighton in May of 2004.  The summary judgment record does not identify the secret shopper, but according to the motion in limine, <u>see</u> <u>Memorandum In Support Of Second Joint Motion In Limine On Admission Of Videotape Evidence</u> (Doc. #243) filed April 3, 2006, the speaker was Thomas.  Nothing in the record suggests that Thomas made these statements on behalf of Brighton as opposed to Sundance, however, or that the new product referred to a Brighton product.

I must admit that you really have a lot of gall to write me this letter. After all the down and dirty slanderous remarks that your sales people have made about Sunlight Saunas over the years – the hypocrisy truly runneth over.

Well Don, the days of Jason Lincoln Jeffers taking slanderous lies lying down, from you or anyone else in this industry, are over. I've had it. You and your unethical staff have driven me to the boiling point. . . .

Guess what Don? Despite your sales staff's futile attempts, Sunlight Saunas did not go out of business. . . . So you may want to go relay some of this information to your sales people. Because your slander is not hurting us anymore. In fact, it's actually helping us. Why? Because it makes your company look assinine. After all, how can a company be going out of business when it was just ranked one of the most successful new companies in the country?

Consider this your FINAL WARNING: Each and every one of these slanderous statements (and dozens more) have been recorded and documented. We have customers that have agreed to sign affidavits. In fact, we have an entire arsenal of customer confessed slander originating from the foul mouths [of] your sales reps over the years at our disposal. And as more slanderous comments continue (regarding our heaters, cabinetry, whatever . . .), they will also be recorded and documented.

So, ENOUGH OF THE IDLE THREATS. If you really want to go to court, then, please, I beg you – nothing would give me more pleasure.

Id.

On June 8, 2004, Soft Heat sent its dealers an e-mail which contained a "Competitive Paper on Sunlight."[11] The e-mail stated as follows:

In our ongoing effort to provide you with powerful marketing material, Soft Heat presents the following comparisons to Sunlight/American Sauna products. I feel the differences are significant enough to sway a potential buyer.

Exhibit 40 to Plaintiff's Memorandum In Opposition (Doc. #200).

On July 30, 2004, Soft Heat sent Sundance and other competitors of Sunlight a follow-up e-mail which

---

[11]    The e-mail does not reveal specific recipients other than Matthew Vroom and Andy Espineira, president of Hufcor, the parent company of Softwall by Airwall.

12

stated,

> I've already sent you this competitive analysis (Sunlight vs. Soft Heat).  But now (thanks to Randy Gomm) I have added the magnetic field comparisons I sent you awhile ago so that you have all the information in one place.
>
> I hope this helps you win deals.  If any of you are still loosing [sic] deals to Sun Light, please share your experience with me so we can develop a counter-attach [sic].

Exhibit 41 to Plaintiff's Memorandum In Opposition (Doc. #200).

On August 24, 2004, Thomas sent the following e-mail message to don@saunabyairwall.com

(presumably Don Metcalfe):

> Hi Don–
> Now that we know Sunlight has not only published lies about our products on their website but also blatantly published lies about their product in order to increase sales, I'm wondering if it's in our combined interest to force them to remove the defaming material.  I am certain our combined losses due to this defamation are not only extreme, but very provable.  I think it's worth our time pursuing.  I thought I would communicate with you first and then talk to Soft Heat, and potentially other competitors about the matter.  I am open to your thoughts on this.  Ultimately, I would like to see an improvement in our bottom line so if you think there is a better way to go about his, let me know.  I feel we can accomplish much more on this issue by combining our resources.  I don't mind competition as long as they play fair.  Sunlight always has and always will play by their own rules and they know no boundaries.

Exhibit 33 to Plaintiff's Memorandum In Opposition (Doc. #200).  On August 26, 2004, Espineira (president

of Hufcor, the parent company of Sauna by Airwall) wrote to Thomas as follows:

> My opinion: Don [Metcalfe] has already sent them a letter that got us no-where [sic] other than a call on our bluff to institute legal action.  Hufcor's position is that we cannot afford another useless and costly legal battle.  This will get us no-where [sic].  Continue to sell honestly and take the high road.

Id.

In the fall of 2004, adverse information about Sunlight products appeared on the website of Sauna by

Airwall.  The website included the following statements:

- Sunlight Saunas wood saunas are currently manufactured by American Infrared Sauna Corporation.  American Infrared Sauna Corporation also markets their sauna directly under the name Cedrus Saunas.

- American Infrared Sauna Corp. and Sunlight Sauna both use the same heaters, yet American Sauna (the manufacturer of Sunlight Sauna) fails to make the Quantam [sic] Wave claim? Wonder Why?

- American Infrared Sauna has been manufacturing since 2003.  How good can a lifetime warranty be if you have only been manufacturing for one year?  Sunlight Saunas have changed manufacturers three times in four years!

- Aluminum is a metal known to have catastrophic effects on the human body.  High exposure has been linked to serious illnesses including osteoporosis, extreme nervousness, anemia, [unreadable text], decreased liver and kidney function and memory loss.

Exhibit 10 to Plaintiff's Memorandum In Opposition (Doc. #200).

On October 4, 2004, Hall obtained an e-mail account for "saunasexposed@yahoo.com" by using the name "Katz Global."  Hall also obtained an e-mail account for "saunasconsumer@yahoo.com" by using the name "Zentek International."  On October 6, 2004, Hall sent an e-mail to "David Cole; matt; Akara; April; Lewis" (employees of Sundance and Brighton) which stated, "Take a look. . . .  Start referring people to the site.  It is ready for the most part.  Send me comments.  Changes."  Exhibit 53 to Plaintiff's Memorandum In Opposition (Doc. #200).  The e-mail contained a link to a website at "www.sunlightsaunas-exposed.com." On October 7, 2004, Thomas sent the following e-mail to Cobalt Multimedia and Murdock (an employee of Sundance and Brighton): "For your guys info as we release this next phase.  I did attempt other routes and this has presented itself as the most viable and effective procedure for dealing with these assholes."  Exhibit 33 to Plaintiff's Memorandum In Opposition (Doc. #200).  That same day, the website at "www.sunlightsaunas-exposed.com" went live.  Hall had developed the website with Thomas, and  he understood that it was "an educational tool to reeducate consumers who had been lied to on the Sunlight Saunas website about products

14

and different companies."[12]  Hall Depo at 212:5-9, Exhibit 13 to <u>Plaintiff's Memorandum In Opposition</u> (Doc.

#200).  When Hall registered the website with Go Daddy, Inc., he used a fictitious name (Rebecca Ellington).

Hall registered Brighton as the contact information, but testified that this was "purely accidental" because Go

Daddy carried over default information from a previous unrelated transaction.  Hall Depo at 44:7-45:2.

     The Hall/Thomas website included the following statements:[13]

Sunlight Saunas Lies
Lie #1: True Ceramic Heaters
     Sunlight Saunas claim that their saunas offer ceramic infrared heaters.
The Truth
     Sunlight Sauna's heaters are made from steel rods and aluminum casing with pink
     paint.  Aluminum can be incredibly toxic inside the body.
Lie #2: Veneer Free Construction
     Sunlight Saunas would have you believe that each of their saunas were 100% veneer
     free[.]
The Truth
     Veneer roof, Veneer "Fresh Air Vent" (doesn't this contradict their entire sales pitch
     about veneer free?).  Not so state-of-the-art antenna.
Lie #3: No Safety Warnings
     Sunlight Saunas has no safety compliance.

---

[12]     Hall and Cobalt Multimedia typically enter into formal contracts before engaging in professional website design.  They did not do so with regard to this website.

[13]     Sunlight claims that over time, Hall and Thomas maintained 16 different versions of this website. For purposes of this motion, the Court uses the version which Hall testified remained live from October 11 through the end of October, 2005.  <u>See</u> Hall Depo. and Hall Depo Exh. 22, <u>Defendants' Memorandum</u> (Doc. #193).  Several other versions included the following disclaimer:

     This site is inspired by persons who post similar information on internet regarding the sauna
     company Sunlight Saunas.  The information below is protected by free speech and people's
     1st Amendment right and are not affiliated or endorsed in any way by Sunlight Saunas. There
     are no commercial uses for this website, it is intended to point out the truth in how sauna
     companies are marketing the sauna product over the web.  Consumers deserve to know the
     truth.  If you feel there are any errors on this site please email at saunaexposed@bigfoot.com.

Exhibit 9 to  <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200) at SD 2421, 2430, 2437, 2444.  The record does not reflect whether Hall ever posted this statement on a live website.

The Truth

> Ever wonder why they aren't UL, CSA, or ETL certified? Ask your home Insurance company about products with heaters operating at several hundred degrees that don't meet these standards. Infrared sauna Heaters operate between 300 and 600 degrees [F]ahrenheit. Can you imagine buying an oven that has not been certified to the minimum standards the USA has established for safety? Now imagine putting those oven heating elements inches from kiln dried wood without any safety certification. Sounds crazy but Sunlight as usual takes the shortcut to profit.

Lie #4: Lifetime Warranty

> Sunlight Saunas offers a lifetime Warranty[.]

The Truth

> Sunlight Saunas would have you believe they are the manufacturer, yet another lie. Do these models look familiar? Sunlight Saunas have changed manufacturers three times in four years. American Infrared Sauna has only been manufacturing since 2003. How can they promise a lifetime?

Lie #5

> Sunlight Saunas presents a list of "exclusive" features. Claiming to be unique.

The Truth

> Sunlight Saunas doesn't even manufacture their own saunas. Other company's [sic] offer the same products without the fraudulent claims.

Hall Depo Exh. 22, Defendants' Memorandum (Doc. #193). The Hall/Thomas website originally included a link to a website which advertised saunas made or sold by competitors of Sunlight. Thomas directed Hall to such information, and on October 11, 2004, he did so. The website included a statement that "[q]uestions or [c]omments about this site can be sent to my email address at: Sunlightsaunas@yahoo.com." Id. Soft Heat provided the images on the website.

On October 7, 2004, Moser (an employee of Sundance and Brighton) sent the following e-mail to fellow employees Thomas, Murdock and Laughlin, along with Hall and Cobalt Multimedia:

> This is our free account I will be e-mailing the Sunlight Saunas exposed site from to our competitors.
>
> User: Sunlightsaunas@yahoo.com
>
> Password: mullethead

16

Exhibit 12 to <u>Sunlight's Memorandum In Opposition</u> (Doc. #200).  On October 8, 2004, somebody sent an e-mail to various competitors of Sunlight (amerec@earthlink.net, ezesauna@swbell.net, frank@miracleheatsaunas.com, info@saunabyairwall.com, info@saunacore.net, info@saunaimage.com, info@sundance-sauna.com, info@softheatinc.com, sales@almostheaven.net, sales@qcaspas.com, sales@saunagen.com and support@healthmatesauna.com).  The e-mail purported to be from "Sunlight Saunas," and stated "Here is a link you should check out."[14]  It also provided a link to the Hall/Thomas website.  That same day, Moser sent Hall an e-mail which stated, "I sent the link to about 14 of our competitors.  We'll see if we get any replies."  Exhibit 68 to <u>Sunlight's Memorandum In Opposition</u> (Doc. #200).

On October 11, 2004, Murdock (an employee of Sunlight and Brighton) sent an e-mail to fellow employee Moser, as well as Hall and Lewis Anderson (an employee of Cobalt Multimedia).  The e-mail referred to a statement on the Hall/Thomas website which said "Here's what happens when an internet company lies to its customers and does fraudulent business."  <u>See</u> Exhibit 9 to <u>Sunlight's Memorandum In Opposition</u> (Doc. #200) at SD 2460.  Murdock stated that the website language was "a B-A-D idea" and asked Cobalt Multimedia to remove it.  <u>See</u> Exhibit 73 to <u>Sunlight's Memorandum In Opposition</u> (Doc. #200).  Hall replied, "This is removed now.  Please give more feedback on the site if you see anything.  Here are the stats on it.  135 page requests so far.  This includes us though . . . http://www.sunlightsaunas-exposed.com/statshide/."  <u>Id.</u>

On October 21, 2004, Brad Campbell of Euro Saunas sent the following e-mail to

---

[14]      Defendants object to this e-mail as hearsay within hearsay.  In this respect and many others, defendants' hearsay objections are conclusory.  The e-mail does not indicate its source.  Sunlight claims that Hall or one of the others at Brighton authored it.  If true, and the sender was acting as an agent of Sundance or Brighton, the message could be admissible under Fed. R. Evid. 801.  Sunlight's burden at trial will be to lay a proper foundation.

Sunlightsaunas@yahoo.com:

> Hello.
>
> I was just referred to your Sunlightsaunas-exposed.com web site.  Interesting information on the company.  I work as the Sales Director for Euro Saunas.  A large concern of the industry, as you are aware of, has been the claims made by various manufacturers and retailers.  Thank you for your site.  I have been aware of these concerns for many months, but it is good to see it presented.
>
> May I ask what your affiliation or relationship with them is or was?

Exhibit 60 to Sunlight's Memorandum In Opposition (Doc. #200).

On October 28, 2004, Thomas sent Hall an e-mail regarding the upcoming Brighton website.  In part it stated as follows:

> I hate to say this but I think it sucks . . . If I was your typical consumer and I clicked on Sunlight[']s site and then I clicked on this homepage, I would be much more impressed with Sunlight.  People don't know flash vs. html etc.  They see and they immediately get, that's the end of [] it.  I just don't feel like this is capturing what we are going after multimedia wise, regardless of how fat the 360's are.  There is no second chance for a first impression.  We've copied on Brighton what we've done with Sundance/Sauna Image, and it's weak.

Exhibit 29 to Plaintiff's Memorandum In Opposition (Doc. #200).[15]

On October 29, 2004, Andrew Botschner, legal counsel for Sunlight, sent a letter through the Hall/Thomas website, stating that the website contained numerous falsehoods and misleading statements and violated Sunlight's intellectual property rights and the Anticybersquatting Consumer Protection Act.  On or about November 5, 2004, Hall took the website down.[16]  Between October 6 and November 5, 2004, the

_____

[15]    While Hall was working on the Brighton website, Thomas was working to secure manufacturing facilities for its Chinese-manufactured products to be offered on the website.

[16]    Zack testified that he believes the website is still in existence because "[y]ou can download the website and you can send it via E-mail, you can save it to a hard drive, and competitors have taken that information and when they go against Sunlight Saunas they share that to mislead and scare away our consumers (continued...)

Hall/Thomas website sent more than 7,500 files to people who requested the web page. A web page consisted of about 10 files, however, so the requests totaled about 750 including plaintiff and all people from Sundance, Brighton and Cobalt Multimedia who looked at the site during and after its development.

On November 7, 2004, Hall e-mailed Thomas a draft e-mail regarding the website, which he proposed to send to sauna retailers. In the final paragraph of the draft, Hall stated, "And remember, do not lie to customers on your website or you may find others like me that have a grudge to hold."[17] Exhibit 80 to Plaintiff's Memorandum In Opposition (Doc. #200). On November 8, 2004, an e-mail from sunlightsaunas@yahoo.com went to 12 e-mail addresses including Sundance. The author of the email is not apparent, but it stated as follows:

> Hello Sauna sellers,
>
> Apparently Sunlight Saunas is not enjoying being exposed. Although everything on this site is clearly factual and in no way violates their right, they have hired legal assistance to try and shut down the site. They are infringing on my first amendment rights. I have considered legal action but at this point it's not worth it to me to continue this site. That said, I am shutting the site down. Many of you have sent me additional information and pictures about Sunlight Saunas that I was planning on posting to the site. I am releasing all rights to any material that was on http://www.Sunlightsaunas-exposed.com. Feel free to use them as you wish.
>
> The site is down now of course, but if you would like me to email the pictures and content of the site to you then that could be arranged.
>
> Best of luck

---

[16](...continued)
from purchasing from us." Zack has no knowledge, however, whether defendants saved or sent the website after December of 2004. A. Zack 11/3/05 Depo at 165:11-20.

[17] When asked whether he held a grudge against Sunlight, Hall testified, "Only from the beginning." Hall Depo at 197:15. He further explained, "it's sad that they walked away from my invoice and just was a screw you mentality when I had never done anything wrong in this case or in the original working relationship." Id. at 197:19-23. Sunlight claims that it hired Hall to create its website, presumably before Hall got involved with Sundance and Brighton. See Pretrial Order (Doc. #187) at 10.

Sunlight Saunas Exposed

Exhibit 46 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).

On November 11, 2004, Thomas sent the following e-mail to Cobalt Multimedia and Murdock (an employee of Sundance and Brighton):

> I think we should try and come up with 50K for 25% of the factory.  I don't see a great advantage in investing more for the potentially small return vs. what we can make on the retail side. . . .  Unless I hear different, I'm going to tell Mark to tell them we are ready to begin the process.
> * * * *
> I also propose that we make a goal of paying off investors within 6 months and deadline of 12 months.  We did it with Sundance, we can do it with Brighton.
>
> Please follow-up asap.  I want to know who can invest what before the 20th.  We need some preliminary commitments.
>
> On a side note, I'll shut Sundance down before I'll let this lawsuit bullshit hold us back.  We will move forward as planned.

Exhibit 47 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).[18]

The following day, on November 12, 2004, Hall called Go Daddy to ask whether the registrant information would show when the domain was cancelled.  He learned that it would not and on November 13, 2004, he cancelled the domain name for sunlightsaunas-exposed.com.  In early 2005, however, Hall talked with Leo Hernandez of Sauna by Airwall about the possibility of establishing another website, and purchased the domain name "sunlightsaunassucks.com."  Hall Depo at 175:15-24.

On December 16, 2004, Sunlight filed this suit against Sauna by Airwall, Sundance and John Does 1-2, alleging tortious interference with contract, tortious interference with prospective business relationship,

---

[18]     Sunlight cites this e-mail as evidence of Brighton's activities during the time of the alleged defamation and as evidence that Thomas created Brighton in case Sundance was held liable in this lawsuit.

trademark infringement, false advertising, false description, cybersquatting, injury to business reputation, unfair

competition, business defamation, and other tortious or deceptive trade practices under the Lanham Act and

Kansas law.  A month later, on January 18, 2005, Thomas sent Hall the following e-mail:

> Just to be extra careful, let's change my password for this email, just in case Sunlight has
> tapped into it.  There's been some interesting timing on a number of incidence [sic] through this
> BS.  I'm sure this is far fetched but may as well be extra cautious.  Let's go over the details via
> phone.  These guys are so burnt toast by the time we get done with them.

Exhibit 48 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).  Four days later, Thomas sent the following

e-mail to Cobalt Multimedia:

> I'm a music person.  Does Sunlight have an advantage if we don't have sound over our
> homepage?  I think they do but am open for discussion.  We should probably get a homie poll
> on this.  Regardless, Brighton is going to beat your ass.

Exhibit 49 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).

On February 5, 2005, Thomas sent Hall and Cobalt Multimedia an e-mail which stated in part as

follows:

> This information does not need a negative spin, it just needs to be out there to re-educate the
> public.  No one likes a liar and no one likes a bad mouther because it displays anger and fear.
> Sunlight-exposed was done in anger.  Sunlight has now responded in anger with these lawsuits.
> All the emails I read in evidence were more or less worthless to the Sunlight cause, but what
> I did realize is that when Sunlight comes up, we are so negative we forget about selling our
> product.  People leave the sales call probably not buying a sauna at all because of how
> negative they feel about the whole thing.
>
> If we can put together something that is ultra factually based I think we will ultimately win
> because Sunlight has already dug their hole of lies, and instead of looking like bad guys as well
> by bad mouthing, we appear to be presenting some facts, "you make up your mind". . . .
> Sunlight has done a good job with this with their little charts of comparison.  Problem is their
> charts were misleading and lied.  If we can just display corrective material to the lies, we take
> the upper hand. * * * *
>
> Sunlight is winning right now with these suits because the truth is limited.  In the short time the
> site was up it reached as far as a Jacuzzi Premium rep. . . .

. . . I'm guessing whatever he and our other attorney's [sic] advise, it's time for an all out onsalught [sic]. Maybe even Sauna Exposed + pics and video sent independently from Sundance. If we can win marketing wise we can afford to fight lawsuit. Every sale we steal hurts them and damages their ability to continue this pointless legal battle.

Exhibit 8 to <u>Defendants' Joint Reply Memorandum Of Law In Support of Defendants' Joint Motion For Summary Judgment</u> (Doc. #212).

On May 19, 2005, Sunlight dismissed John Does 1-2, added Sherman Act antitrust claims and California false advertising claims and added Brighton, Hall and Cobalt Multimedia, Inc. as defendants. On July 12, 2005, Sunlight also filed suit against Jeffers, seeking to restrain him from interfering with its customers, employees and business relationships.

On October 18, 2005, Sunlight and Sauna by Airwall filed a joint motion and stipulation for dismissal, based on a confidential settlement. The Court has therefore dismissed all claims involving Sauna by Airwall. On March 15, 2006, the Court dismissed Hall and Cobalt Multimedia for lack of personal jurisdiction. Accordingly, plaintiff's remaining claims are against Sundance and Brighton. The pretrial order sets forth the following claims: tortious interference with contract (Count I); tortious interference with prospective business relationship (Count II); trademark infringement, dilution and unfair competition (Count III); defamation (Count IV); injurious falsehood (Count VI); civil conspiracy against Sundance and Brighton (Count VII); civil conspiracy against all defendants (Count VIII); prima facie tort (Count IX); unfair business practices under Cal. Bus. & Prof. Code § 17200 (Count XII); false advertising under Cal. Bus. & Prof. Code § 17500 (Count XIII); false advertising in violation of Section 43(a)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (Count XIV); false description in violation of Section 43(a)(A) of the Lanham Act, 15 U.S.C. § 1125(a) (Count XV); cybersquatting (Count XVI); and antitrust activity in violation of the Sherman Act, 15 U.S.C. § 1

(Count XVII).[19]

<u>Damages Allegedly Sustained By Plaintiff</u>

Connie Zack kept notes of customers and distributors who communicated to Sunlight the disparaging statements which defendants and other competitors made to them.  She did not have a list of customers, and she testified that "[a] lot of it is in the heads of the salespeople."[20]   In early October of 2004, Sunlight determined through direct communication with affected customers that 23 of them did not buy (or possibly did not buy) a sauna due to the Hall/Thomas website.[21]  <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200) ¶ 182. While he could not identify any specific individual, Zack testified that he had "heard of numerous individuals who have been confused by the two websites."  A. Zack 6/29/05 Depo at 89:10-14.

On November 5, 2004, Darren Jordison of Jacuzzi Premium Spas sent the following e-mail to Lisa Zinnecker, plaintiff's sales manager: "Please check out the following link and explain what is going on with your company."  Exhibit 64 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).  The link was to the Hall/Thomas website, and Jordison had received it in an e-mail from somebody who had decided to purchase a Health Mate

---

[19]     Plaintiff has abandoned the following claims: (1) negligent defamation (Count V); (2) wrongful appropriation of goodwill and financial benefits associated with plaintiff's trade name and mark (Count X); and (3) defamation under California law (Count XI).

Sundance and Brighton set forth the following counterclaims against Sunlight: false advertising in violation of the Lanham Act (Counterclaim I); contributory false advertising in violation of the Lanham Act (Counterclaim II); false advertising under Cal. Bus. & Prof. Code § 17500 (Counterclaim III); unfair business practices under Cal. Bus. & Prof. Code § 17200 (Counterclaim IV); and false comparative advertising under Cal. Bus. & Prof. Code § 17508 (Counterclaim V).

[20]     Plaintiff cites an e-mail exchange between the Zacks which lists customers whom Sauna by Airwall allegedly influenced.  <u>See</u> Exhibit 84 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).

[21]     The exhibit which supports this statement lists 16 customers who did not purchase and seven "possibilities" of lost customers.  Exhibit 85 to <u>Plaintiff's Memorandum In Opposition</u> (Doc. #200).  Defendants did not controvert this statement of fact.

sauna.

On November 12, 2004, Connie Zack sent Zack and Jeffers a memo which stated as follows:

Attached is an excel spreadsheet of the sales we lost starting Oct. 4th which I believe we lost due to Sunlight Saunas exposed. O[f] course, there are tons of other customers who we DON'T KNOW whether they purchased or not.  We can have Justin call the people we haven't been able to get a hold of to see if they have purchased or not???

On Tuesday at the sales meeting I will review this with the sales force and see if they have anyone else to add to the list.

Please let me know if you both have any other thoughts on how to quantify this.  The other piece that is hard to measure is HOW MANY sales have been lost from our distributors as a result of SS exposed.  The only distributor I am comfortable asking is Bob Sterling.

Exhibit 85 to Plaintiff's Memorandum In Opposition (Doc. #200).

On December 8, 2004, Sandra De Vault, who is apparently a Sunlight distributor or sales representative, sent Connie Zack the following e-mail:

I had a phone conversation with a lead of ours who said that she had been turned off Sunlight Saunas for a variety of reasons, many of them raised in a (no longer existing) website called "Sunlight Saunas exposed" – I have asked her to mail me a copy of the information she downloaded from the site before it was removed, & when I receive it I will forward it on to you with a list of her queries she would like answered. (ie her main concerns).

Exhibit 62 to Plaintiff's Memorandum In Opposition (Doc. #200).  Four days later, Connie Zack received the following e-mail from sales@sunlightsaunas.com.au: "Please find attached the information one of our leads sent to me today, regarding below email (SS exposed).  We will await your response before re-contacting the lady."[22]  Id.

Jeffers left Sunlight in January of 2005, and by March of 2005, Zack had cancelled his American

---

[22]    It is not clear from the record whether this e-mail responded to the previous e-mail or whether it refers to a second potential customer.

Express card which had been used to pay for one of Sunlight's internet marketing accounts.  As a result, that internet service was interrupted for about one week.  Sometime between January and March of 2005, Sunlight also installed a new data base and a new phone system.

Sunlight met its sales goals in October of 2004.  Internal salespeople "had difficulty" in November of 2004, but Zinnecker did not know whether customers chose other products or simply did not buy.  Sunlight did not meet its sales goals in March, April or May of 2005.[23]  Zack stated that when questioned, Lisa Zinnecker attributed the shortfall to Brighton and Sundance and the Hall/Thomas website.  Zinnecker never told Zack or any other member of management that the data base and telephone system changes should have been implemented during a slower month or that the changes had a significant negative effect on sales.  Zack

---

[23]     Zack testified that Sunlight makes annual sales projections based on general discussion between the months of March, April, May, and June and set annual goals as follows:

4.  The annual sales projections are arrived at by various analyses . . . .

5.  The annual sales projections are determined, in part, by reviewing numerous and various documents, including but not limited to financial documents, previous years' sales documents, and marketing documents.

* * * *

7.  The annual sales projections are also based on information obtained by the attendees of the various meetings, including but not limited to information obtained regarding various market factors, competitors' information, and other information that may or may not affect Sunlight Saunas' upcoming sales.

8.  The finalized annual sales projections are thereafter determined by considering all the aforementioned information and then taking the number of sales people at Sunlight Saunas, its distributors (domestic and international), and multiplying each of them by an appropriately arrived-at forecasted number of units sold per month.  In the past, a slight adjustment has been applied to the monthly unit sales number in an effort to account for historic seasonality in our sales figures.

Declaration Of Aaron M. Zack, Exhibit 18 to Plaintiff's Memorandum In Opposition (Doc. #200).  Jeffers testified that Sunlight doubled its actual sales in 2002/2003, and that Zack first began setting sales goals by assuming that it would continue to do so on an annual basis.

25

attributed the lackluster performance in March to lingering effects and continuing actions of defendants.  Lisa Zinnecker testified at her deposition that several factors contributed to Sunlight's failure to meet sales goals for April and May:

> I remember having a meeting with Connie and Aaron . . . I just felt that there was a shift in the market, where typically there might have been five true competitive companies, you know.  I think we were seeing a lot of the smaller types of cheaper saunas coming into play and people probably impulsively buying those cheaper saunas.  And I remember saying something, there is a shift in the market.  There is a shift I think with an increase of awareness of infrared.  There is also an opportunity for more businesses to take the opportunity.  And I think there's another aspect that was happening.

L. Zinnecker Depo at 119:16 - 120:8, <u>Defendants' Memorandum</u> (Doc. #193).

In June of 2005, defendants deposed Zack.  In response to questions about damages, Zack testified that he had not done anything to calculate damages, that knowledge of lost sales was not his expertise and that all information had been provided to his attorneys.  He did not know plaintiff's market share or the relative market shares of its competitors.  No third party industry reporting of sauna sales is available, and Zack does not know the market shares or numbers of sauna manufacturers in North America.  Though Zack does not know how many Chinese sauna manufacturers exist, low-cost Chinese sauna manufacturers have been posing competition since the first part of 2005.

Zack testified that Sunlight's gross sales for 2004 saunas ranged between $5 to $7 million, as contrasted with 2003, which he estimated to be in the range of $2.5 to $4 million.  At the time of his deposition, Zack had not compiled the 2005 data.  He testified, "I definitely don't feel we are doing better.  All of this – this situation that we have been in with this website has definitely impacted our business."  A. Zack 6/29/05 Depo at 101:21-24.  Zack stated that he believed Sunlight's growth should have been far superior to what it was.

On June 29, 2005, defendants deposed Connie Zack, who testified that Sunlight does not keep formalized reports and that she had not provided specific figures related to damages. When asked to give specific examples of lost sales, she identified Diana Harbison, Dan Cabral, Darren Jordan and "Doug" in California, but testified that there were "tons" of specific instances where a sale was canceled or lost. She testified that Jordan had received the Hall/Thomas website, which "really freaked him out" C. Zack Depo at 99:25 to 100:1, Defendants' Memorandum (Doc. #193). Sunlight did not ask its salespeople to list lost sales, but it has "tons of that information." Id. at 104:12-17 and 110:4-7.

## Analysis

## I.      Defendant Brighton Sauna, Inc.'s Motion For Summary Judgment

Plaintiff asserts the following claims against Brighton: (1) Brighton tortiously interfered with contracts between it and unnamed customers (Count I); (2) Brighton tortiously interfered with prospective business relationships between it and unnamed potential customers (Count II); (3) Brighton engaged in trademark infringement, dilution and unfair competition by using plaintiff's trademark "SUNLIGHT SAUNAS" without authorization (Count III); (4) Brighton defamed plaintiff by conveying false and/or misleading information about its business practices (Count IV); (5) Brighton told injurious falsehoods by conveying false and/or misleading information about plaintiff's products (Count VI); (6) Sundance and Brighton conspired with Sauna by Airwall and other competitors to defame plaintiff and disparage its products (Count VII); (7) Sundance and Brighton conspired with Hall and Cobalt Multimedia to develop a website which defamed plaintiff and disparaged its products (Count VIII); (8) Brighton committed a prima facie tort by maintaining a website which implied that Sunlight engaged in untrustworthy business practices and sold unsafe products (Count IX); (9) Brighton falsely advertised plaintiff's products in violation of Section 43(a)(B) of the Lanham Act, 15 U.S.C. § 1125(a)

(Count XIV); (10) Brighton engaged in false description by using the "SUNLIGHT SAUNAS" trademark and trade name on the website in a way which was likely to cause confusion, mistake or deception as to the affiliation, connection, approval, sponsorship or association of plaintiff's products, in violation of Section 43(a)(A) of the Lanham Act, 15 U.S.C. § 1125(a) (Count XV); (11) Brighton registered a domain name (sunlightsaunas-exposed.com) without plaintiff's consent and with the bad faith intent to profit, a practice known as cybersquatting (Count XVI); and (12) Brighton engaged in antitrust activity in violation of the Sherman Act, 15 U.S.C. § 1, when it conspired with Sundance, Sauna by Airwall and Soft Heat to defame it, disparage its products, refuse to deal with it and share competitively sensitive information, all to pressure suppliers and customers not to deal with it (Count XVII).

Brighton argues that because it had no assets or employees and was therefore incapable of engaging in wrongful conduct before February of 2005, it is entitled to summary judgment. Specifically, Brighton contends that (1) it was not incorporated until July 1, 2004, so it could not have participated in wrongful conduct in the spring or summer of 2004; (2) Sunlight has no evidence that it received or republished the "Competitive Paper on Sunlight" which Soft Heat distributed on June 8, 2004; (3) the record contains no evidence that it participated in threats to institute legal proceedings by Sauna by Airwall on July 9, 2004; (4) Hall's registration of the Hall/Thomas website in its name was a mistake, and does not show that Brighton was involved in the website.

Neither party cites relevant case law whether a newly formed corporation might be liable for conduct on its behalf before the actual date of incorporation (here, July 1, 2004). The Court need not reach this issue, however, because some of Brighton's allegedly wrongful acts occurred after its incorporation. Furthermore, on this record, it is not irrefutably established that Brighton had no assets and employees before February of

28

2005, and no involvement with the actionable events in this case. Even if Brighton did not receive or republish the "Competitive Paper on Sunlight" from Soft Heat, and did not participate in the threats of legal proceedings from Sauna by Airwall, the Court cannot conclusively hold that its only involvement in the Hall/Thomas website was a "mistake."

Thomas incorporated Brighton on July 1, 2004, and in the fall of 2004, Thomas and others worked to secure manufacturing facilities for Chinese-manufactured products to be offered on the Brighton website. Defendant Brighton's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #195) filed January 20, 2006 at 5. From September of 2004 to February of 2005, Brighton worked with Hall and Cobalt Multimedia to develop its website. Id. In light of these facts, to contend that Brighton's employee and owners could not have engaged in activities for which the corporation could be held liable is disingenuous. A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence or choose between competing inferences. Windon Third Oil & Gas Drilling P'ship v. Fed. Deposit Ins. Corp., 805 F.2d 342, 346 (10th Cir. 1986). Whether Thomas and Hall acted on Brighton's behalf is a question of fact for the jury, not a question of law to be determined on summary judgment.

Furthermore, while some evidence suggests that Hall and Sundance created the website – not Hall and Brighton – other evidence could lead a reasonable jury to infer that Brighton participated in the website and other tortious activity. Construing the facts in the light most favorable to Sunlight, Hall used Brighton's contact information in registering the website and did so on Brighton's behalf. Brighton argues that it would be "ludicrous" to suggest that it had an interest in promoting the Hall/Thomas website when it had no prospects for sales until months later. Id. at 29. Given the apparent animus between the parties, however, a reasonable jury could conclude otherwise. Plaintiff has raised a genuine issue of material fact. The Court therefore

29

overrules Brighton's motion for summary judgment.

Brighton's reply brief asserts that it is not the alter ego of any defendant, and rejects "[t]he unspoken premise behind plaintiff's scatter-shot marshaling of the evidence . . . that . . . Brighton, Sundance, and Cobalt Multimedia are one and the same." Defendant Brighton's Reply To Plaintiff's Response In Opposition To Defendant Brighton's Motion For Summary Judgment (Doc. #210) filed March 1, 2006 at 23. As noted, however, Brighton did not raise this argument until its reply brief. This argument is not properly before the Court, see Thurston v. Page, 931 F. Supp. 765, 768 (D. Kan. 1996) (court will not consider argument first raised in reply brief), and is irrelevant because Sunlight is not attempting to pierce the corporate veil of any defendant.

## II.     Sundance And Brighton's Motion For Summary Judgment[24]

### A.     Common Law Claim For Trademark Infringement, Dilution And Unfair Competition (Count III)

Sunlight bring a unitary common law claim for trademark infringement, dilution and unfair competition under Kansas law. Specifically, according to the pretrial order, Sunlight claims that "[d]efendants used Sunlight Saunas['] trade name 'Sunlight Saunas' and trademark 'SUNLIGHT SAUNAS' on the website www.sunlightsaunas-exposed.com to confuse the public." Pretrial Order (Doc. #187) at 17. The pretrial order states that the following are the elements of this claim: (1) "Sunlight Saunas' trade name or mark is famous, distinctive, or has acquired secondary meaning in Kansas;" (2) "defendant[s] knew of Sunlight Saunas' prior use of, and common law rights to, its 'SUNLIGHT SAUNAS' trademark and trade name 'Sunlight Saunas;'"

---

[24]     Sundance and Brighton have filed this as a joint motion. Except for plaintiff's claims under California law, all claims are against both defendants. Plaintiff has two claims against Sundance under California law.

(3) "defendant[s] used Sunlight Saunas' trade name or mark without authorization;" (4) "defendant[s'] use diluted Sunlight Saunas' trade name or mark, or caused a likelihood of confusion among Kansas consumers;" (5) "defendant[s] acted intentionally, willfully, and maliciously with an intent to trade on the good will associated with Sunlight Saunas' trade name or mark;" and (6) Sunlight suffered damages as a result. Id. at 19.

Defendants' summary judgment motion does not separately address this claim, and the Court assumes that it remains for trial.[25]

### B.    Lanham Act Claims

Sunlight asserts three claims under the Lanham Act, 15 U.S.C. § 1125(a) and (d): (1) defendants engaged in false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count XIV); (2) defendants engaged in false description of Sunlight products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count XV); and (3) defendants "cybersquatted" by using the Sunlight trade name and mark in the domain name of the Hall/Thomas website, in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d) (Count XVI).  Defendants argue that they are entitled to summary judgment on all Lanham Act claims because (1) their website speech is protected by the First Amendment; and (2) plaintiff has no evidence of damages under the Lanham Act.  Defendants argue that they are entitled to summary judgment on plaintiff's false advertising claim because their website statements were not false or material and did not cause damage to plaintiff.  As to plaintiff's false description claim, defendants argue that they are entitled to summary judgment because they did not use plaintiff's mark in a way which could cause confusion to consumers or suggest plaintiff's endorsement.  Finally, as to plaintiff's cybersquatting claim,

---

[25]        Defendants only discuss this claim as a tangent to plaintiff's claims for false description and false advertising under the Lanham Act.

defendants seek summary judgment because as a matter of law, their use of plaintiff's trade name constituted a fair use.

### 1.   Commercial Speech Or Protected Noncommercial Speech

The Lanham Act regulates commercial speech.  See Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003); Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir. 1999); Savannah Coll. of Art & Design, Inc. v. Houeix, 369 F. Supp.2d 929, 943 (S.D. Ohio 2004).  It prohibits commercial use of a word or name or any "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" which (1) is likely to cause confusion or to deceive, as to the origin, sponsorship, or approval of goods, or (2) misrepresents characteristics and/or qualities of another person's goods in commercial advertising or promotion.  A person who engages in such activities "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a).  Prior to 1989, courts treated the Lanham Act as "purely an anti-false advertising statute."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:91 (4th ed. 2005).  Since 1989, federal law has permitted claims which involve a false statement of fact which disparages the goods of another.  Id.

Defendants deny that their website statements constituted "commercial" speech, noting that they did not advertise or sell goods or services, and that they only used plaintiff's mark to criticize plaintiff.  Defendants contend that their website speech was noncommercial criticism of plaintiff – a classic "gripe site."  Sunlight argues that defendants did not solely convey a communicative message in the website domain name and that defendants' use of its mark confused consumers about the source of the website.

In Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67 (1983), the Supreme Court discussed three factors in determining whether speech is commercial or noncommercial: (1) whether the communication

is an advertisement, (2) reference to a specific product, and (3) the economic motivation of the speaker. In Bolger, the Supreme Court found unconstitutional a federal statute which prohibited the mailing of informational pamphlets that advertised contraceptives. The Supreme Court found that the pamphlets constituted commercial speech, and emphasized that their discussion of important public issues such as venereal disease and family planning did not warrant the full constitutional protection afforded noncommercial speech because the pamphlets "link[ed] a product to a current public debate." Id. at 68 (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 563(1980)). In Proctor & Gamble Co. v. Haugen, 222 F.3d 1262 (10th Cir. 2000), a case under the Lanham Act, the Tenth Circuit examined defendant's statement that Proctor & Gamble was a corporate agent of Satan. In evaluating whether this statement was commercial speech under the Lanham Act, the Tenth Circuit adopted a four-part definition of commercial advertising: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to relevant purchasing public to constitute "advertising" or "promotion" within the industry.[26] Id. at 1273-74. Applying these factors, the Tenth Circuit found that absent a "significant theological, political, or other noncommercial purpose" underlying the speech, a message which urged recipients to purchase defendant's products over those of plaintiff constituted commercial speech. Id., 222 F.3d at 1275.

Domain names may constitute expressive speech. See, e.g., Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 585 (2d Cir. 2000). Domain names are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses particular

---

[26]     The Tenth Circuit noted that the meaning of commercial speech under the Lanham Act tracks the First Amendment "commercial speech" doctrine. Proctor & Gamble, 222 F.3d at 1274.

circumstances presented with respect to each domain name.  Id. at 586.  This analysis requires a "particularistic, context-sensitive analysis . . . including analyses of the domain name itself, the way the domain name is being used, the motivations of the author of the website in question, [and] the contents of the website." Id.

Under the foregoing case law, the Court cannot find as a matter of law that defendants' website speech, including the chosen domain name, is "noncommercial" speech.  Although the speakers on the website were anonymous or disguised, they were direct competitors of Sunlight and defendants had no apparent reason to disparage Sunlight products except to promote their own.  Viewing the evidence in the light most favorable to Sunlight, it is clear that the website was intended to have broad dissemination, and to divert potential customers of plaintiff.  For a few days, the website even included direct links to competitors.  It also stated that "other compan[ie]s offer the same products without the fraudulent claims."  A reasonable jury could therefore find that defendants were not motivated solely (or at all) by disinterested, altruistic concern for sauna purchasers.

## 2.    False Advertising Under The Lanham Act (Count XIV)

As noted, Sunlight claims that defendants engaged in false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a), by misrepresenting its products on the website. Defendants seek summary judgment on this claim, arguing that plaintiff has no evidence that its statements were (1) false or misleading, (2) material or (3) damaging to plaintiff.

To establish a claim for false advertising under the Lanham Act, plaintiff must show the following:

(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

34

Sally Beauty Co., Inc. v. Beautyco, Inc., 304 F.3d 964, 980 (10th Cir. 2002); Larkin Group, Inc. v. Aquatic Design Consultants, Inc., 323 F. Supp.2d 1121 (D. Kan. 2004).

### a.  Falsity

The Lanham Act covers statements which are both literally false and impliedly false. See Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp.2d 1197, 1209 (D. Kan. 2003).  When defendant's advertisement is literally false, circuits differ whether plaintiff must show materiality.  The Tenth Circuit has not squarely addressed the question, but the First, Second and Eleventh Circuits have required plaintiffs to prove that false or misleading statements are material.  Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1250 (11th Cir. 2002); Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002); S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).  The Fifth Circuit has held that where defendant has made literally false statements, defendant's statements are presumed to mislead consumers and plaintiff need not produce evidence on materiality.  Pizza Hut, Inc., v. Papa John's Int'l, Inc., 227 F.3d 489, 497 (5th Cir. 2000).

To determine whether a representation is literally false, the Court must "analyze the message conveyed within the full context of the advertisement."  Hill's Pet Nutrition, Inc., 258 F. Supp.2d at 1209.  Plaintiff contends that defendants made five literally false statements on the Hall/Thomas website:

> (1)  "Lie #1: True Ceramic Heaters.  Sunlight Sauna's heaters are made from steel rods and aluminum casing with pink paint.  Aluminum can be incredibly toxic inside the body."

Sunlight has presented evidence that until Jeffers saw a photo of the heater on the Sauna by Airwall website, it did not know that its heater was not completely ceramic.  Sunlight also contends that by saying the heaters were 100 per cent ceramic, it meant that the ceramic in the heaters was 100 per cent pure.  Defendants

have no evidence that the ceramic was not pure, and a reasonable jury could believe that Sunlight did not "lie" when it advertised its heaters as "100% pure ceramic heaters." Such a jury could find that defendants falsely accused plaintiff of lying about the ceramic heaters, and also believe that defendants falsely stated that "Sunlight Sauna's heaters are made from steel rods and aluminum casing with pink paint."

> (2)     "Lie #2: Veneer Free Construction.  Sunlight Saunas would have you believe that each of their saunas were 100% veneer free."

Sunlight claims that defendants falsely accused it of lying about the veneer in its saunas and falsely stated that "Sunlight Saunas would have you believe that each of their saunas were 100% veneer free." Sunlight asserts that it never stated that each sauna was 100 per cent veneer free. In addition, Sunlight claims that it qualified what portion of the saunas it did advertise as "veneer-free." Defendants do not cite statements by plaintiff which dispute this fact. Again, a reasonable jury could find that plaintiff truthfully advertised its product and that defendants falsely stated that plaintiff "lied" about whether its saunas contained veneer.

> (3)     "Lie #3: No Safety Warnings: Sunlight Saunas has no safety compliance."

Plaintiff has provided undisputed evidence that it had safety certification (although such certification was not UL-, CSA- or ETL-listed), which directly refutes defendants' statement that "Sunlight Saunas has no safety compliance." Defendants argue that they qualified their statement by truthfully pointing out which certifications plaintiff did not have. Even so, the first statement is literally false, and the follow-up qualifying statement does not tell the whole story. Defendants also stated "No safety warnings" but do not dispute that plaintiff supplied a sauna product manual which contained safety warnings and general safety information.

> (4)     "Lie #4: Lifetime Warranty" and "Sunlight Saunas would have you believe they are the manufacturer, yet another lie."

Sunlight asserts that defendants misled customers with their statements that "Lie #4: Lifetime Warranty"

36

and "Sunlight Saunas would have you believe they are the manufacturer, yet another lie." Sunlight argues that

defendants implied that it made a false claim.  Defendants deny that plaintiff has provided evidence of a

warranty, but concede that plaintiff offers a lifetime manufacturer's warranty with its saunas.  A reasonable jury

could believe that plaintiff's offer of a lifetime warranty was the same as a lifetime manufacturer's warranty and

that it did not "lie" when it made such offer.  Plaintiff also explained that some organizations may consider

Sunlight to be a manufacturer because it designs its own saunas and that in any case, it never claimed to build

its own saunas.  See A. Zack 6/29/05 Depo at 65:13-20.  A reasonable jury could find that plaintiff did not

lie about whether it was the manufacturer of its saunas.

> (5)  "Lie #5: Sunlight Exclusives.  Sunlight Saunas presents a list of 'exclusive' features.
> Claiming to be unique. . . . Sunlight Saunas doesn't even manufacture their own
> saunas.  Other companies offer the same products without the fraudulent claims."

Sunlight cites evidence that its saunas have some unique features and that no other company offers the

exact product – evidence which defendants do not dispute.  Considering defendants' statements about exclusive

features as a whole, a reasonable jury could find that defendants falsely stated that other companies offer the

same products without the fraudulent claims.  In addition, the website labels plaintiff's product claims as "lies."

A lie is defined as "an assertion of something known or believed by the speaker to be untrue."  Webster's Third

New International Dictionary 1305 (1993).  To paste such a label throughout the website implies that Sunlight

knowingly advertised its own product falsely.  Plaintiff has raised a genuine issue of material fact whether

defendants made literally false statements on the website.

### b.    Materiality

Defendants next argue that Sunlight has not presented evidence that any false statements

were material.  To establish that a representation is material, plaintiff must show that it is likely to influence

purchasing decisions.  See id. at 1211 (D. Kan. 2003); see also Johnson & Johnson Vision Care, Inc., 299 F.3d at 1250;  Cashmere & Camel Hair Mfrs. Inst., 284 F.3d at 311 (plaintiff need not show that misrepresentation actually influenced purchasing decisions, only that it was likely to influence).  Defendants contend that such evidence is generally shown through a market study or consumer survey, neither of which plaintiff has conducted.  The First Circuit has not required such measures when the false or misleading statement "relates to an 'inherent quality of characteristic' of the product.  Cashmere & Camel Hair Mfrs. Inst., 284 F.3d at 311-12 (quoting Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997)).  In addition, in Pizza Hut, the Fifth Circuit explained as follows:

> The type of evidence needed to prove materiality . . . varies depending on what type of recovery the plaintiff seeks. Plaintiffs looking to recover monetary damages for false or misleading advertising that is not literally false must prove actual deception.  See Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 690 (6th Cir. 2000); Resource Developers, 926 F.2d at 139.  Plaintiffs attempting to prove actual deception have to produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements.  See, e.g., PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 271 (2d Cir. 1987) ("Actual consumer confusion often is demonstrated through the use of direct evidence, e.g., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests.").
>
> Plaintiffs seeking injunctive relief must prove that defendant's representations "have a tendency to deceive consumers."  Balance Dynamics, 204 F.3d 683 at 690.  See also Resource Developers, 926 F.2d at 139; Blue Dane Simmental Corp. v. American Simmental Assoc., 178 F.3d 1035, 1042- 43 (8th Cir. 1999); Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753 (8th Cir. 1980); 4 McCarthy on Trademark and Unfair Competition § 27:36 (4th ed.).  Although this standard requires less proof than actual deception, plaintiffs must still produce evidence that the advertisement tends to deceive consumers.  See Coca-Cola Co. v. Tropicana Prod., Inc., 690 F.2d 312, 317 (2d Cir.1982) (noting that when seeking a preliminary injunction barring an advertisement that is implicitly false, "its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction"). To prove a tendency to deceive, plaintiffs need to show that at least some consumers were confused by the advertisements.  See, e.g., American Council, 185 F.3d at 618 ("Although plaintiff need not present consumer surveys or testimony demonstrating actual deception, it must present evidence of some sort demonstrating that consumers were

misled.")

227 F.3d at 497-98.

In this case, the parties agree that consumers base sauna-purchasing decisions on the following factors: price, appearance, product safety, quality of construction, heater efficiency and effectiveness and existence of warranty. See Defendants' Joint Reply (Doc. #212) filed March 1, 2006 at 77. The statements on the Hall/Thomas website spoke directly to product safety, quality of construction of the heaters and the saunas and plaintiff's warranty. Safety and construction are inherent characteristics of the product. Because defendants have conceded that these factors influence purchasing decisions, plaintiff need not produce a consumer surveys or market studies to raise a genuine issue of material fact as to materiality.

### c.    Damages

Defendants argue that Sunlight has not shown injury and cannot establish a causal link between any false statements and any alleged injury. Sunlight argues that a fact finder can presume causation and injury because defendant made literally false or demonstrably deceptive statements.

In Hutchinson v. Pfeil, 211 F.3d 515 (10th Cir. 2000), the Tenth Circuit discussed presumption of injury. While that case involved a question of standing, the Tenth Circuit recognized and discussed the presumption of injury in Lanham Act claims. Defendants argue that under Hutchinson, the presumption of damage rule is "greatly disfavored and rarely applied," Defendants' Joint Reply (Doc. #212) at 97, but they misinterpret the Tenth Circuit comments. In Hutchinson, the Tenth Circuit actually stated that "the presumption has been discussed, albeit rarely and unfavorably." 211 F.3d at 522. The Tenth Circuit further stated that "the presumption is properly limited to circumstances in which injury would indeed likely flow from the defendant's objectionable statements, i.e., when the defendant has explicitly compared its product to the plaintiff's or the

39

plaintiff is an obvious competitor with respect to the misrepresented product." Id. at 522.  For the presumption

to apply, defendants' statements must be literally false or demonstrably deceptive.  Id.

Here, Sunlight is an obvious competitor, and it has raised a genuine issue of fact whether the website

statements were literally false.  For purposes of summary judgment, the Court presumes causation and harm

because injury would likely flow from the website statements.  Defendants claim that plaintiff has no evidence

of damages.  The Court addresses this question in the next section.

### 3.    False Description Under The Lanham Act (Count XV)

Sunlight alleges that defendants engaged in false description of its products by using "Sunlight

Saunas" in the website domain name and establishing the sunlightsaunas@yahoo.com e-mail account, in

violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a).  Defendants argue that they are

entitled to summary judgment because (1) they did not use plaintiff's mark in a way that would cause consumer

confusion or suggest that it endorsed the website and (2) plaintiff has no evidence of damages.

### a.    Confusion

To establish false description under Section 43(a) of the Lanham Act, 15 U.S.C. §§

1125(a), plaintiff must show that (1) defendants used a false designation of origin or false description or

representation in connection with goods or services; (2) the goods or services entered interstate commerce;

and (3) plaintiff was damaged by the use of such false description.  See Polo Fashions, Inc. v. Diebolt, Inc.,

634 F. Supp. 786, 789-90 (D. Kan. 1986); see also Kennedy v. Nat'l Juvenile Det. Ass'n, 187 F.3d 690,

696 (7th Cir. 1999).  Plaintiff must also show that the description or representation was likely to cause

confusion.  Polo Fashions, Inc., 634 F. Supp. at 789-90.  To establish a false description claim, plaintiff must

show confusion as to the affiliation, connection, approval, sponsorship or association of a product or service.

40

15 U.S.C. § 1125(a)(1).  Likelihood of confusion is a question of fact.  Beer Nuts, Inc. v. Clover Club Foods

Co., 805 F.2d 920, 923 n.2 (10th Cir. 1986).  The Tenth Circuit has identified guiding factors in determining

the likelihood of confusion as follows:

> (a)    the degree of similarity between the designation and the trade-mark or trade name in
> (i)     appearance;
> (ii)    pronunciation of the words used;
> (iii)   verbal translation of the pictures or designs involved;
> (iv)    suggestion;
> (b)    the intent of the actor in adopting the designation;
> (c)    the relation in use and manner of marketing between the goods or services marketed
> by the actor and those marketed by the other;
> (d)    the degree of care likely to be exercised by purchasers.

Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 940 (10th Cir. 1983) (adopting factors as set out

in Restatement of Torts § 729 (1938)).

Defendants concede that the first factor  – the similarity of the marks – weighs in favor of Sunlight.  As

to the second factor – defendants' intent in adopting the mark – defendants argue that their intent was to

educate consumers – not to confuse them as to the affiliation, connection, approval, sponsorship or association

between Sunlight and the website or between Sunlight and the e-mail account at sunlightsaunas@yahoo.com.

Viewed in the light most favorable to plaintiff, however, defendants had no reasons to "educate consumers"

except to enhance their competitive positions at the expense of Sunlight.  Defendants in fact bragged that "these

guys are so burnt toast by the time we get done with them;" "this [website] is going to take them down pretty

hard;" "its time for an all out onslaught," "[e]very sale we steal hurts them," and "I will devote unbelievable

resources to dissolve them."  Thomas admitted that the website was created out of anger.  On this record, a

reasonable jury could conclude that defendants' intent was self-serving and not educational or disinterested.

41

Defendants contend that because they did not sell goods or services through the website, the third factor – the relation in use and manner of marketing between the goods or services marketed by the competing parties – weighs in their favor. The Tenth Circuit noted that the means by which the products are marketed is relevant to likelihood of confusion. Beer Nuts, Inc., 711 F.2d at 941. The possibility of confusion is greatest when products reach the public by the same retail outlets. Id. In Sally Beauty Co., Inc. v. Marianna Imps., Inc., 304 F.3d 964, 974 (10th Cir. 2002), the Tenth Circuit considered the parties' manner of marketing and the outlets through which their products reached the market. Id. at 974-75. Here, Sunlight and defendants sold similar saunas over the Internet. They were competitors and sold in the same market. Furthermore, at least for a short time, the website included links to competitors. Plaintiff has raised a genuine issue of material fact as to the third factor.

As to the fourth factor – the degree of care exercised by purchasers – the parties agree that sauna purchasers are likely to exercise a great deal of care. A consumer exercising a high degree of care reduces the likelihood of confusion. Id. at 975. Plaintiff argues that potential customers would exercise little care, however, in reviewing the voluminous material on the Internet and would be quickly and adversely persuaded by the website. Defendants argue that because no goods or services were offered on the website, customers were not likely to be confused about the source of the saunas discussed on the website. Even if defendants are correct on this point, sauna purchasers could reasonably have been confused about whether Sunlight sponsored or associated with the website and/or e-mail account. Confusion remains a question of fact for the jury.

On this record, defendants have not established that as a matter of law, they are entitled to summary judgment on this issue of confusion. A reasonable jury could find that they intended to infringe on plaintiff's mark and that consumers were likely to be confused as to the sponsorship of the website and e-mail account.

42

### b.    Damages

Defendants argue that they are entitled to summary judgment because plaintiff has no evidence of damages.  The Lanham Act provides that a plaintiff may recover for violation of its rights as follows:

> When . . . a violation under section 1125(a) or (d) of the title . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117(a).  Plaintiff contends that the presumption of injury and damages applies to all claims under the Lanham Act.  The Court disagrees.  In <u>Hutchinson</u>, the Tenth Circuit specifically discussed false advertising claims where the defendant made literally false representations.  Plaintiff has not pointed to any cases where the Tenth Circuit has presumed damages for claims of false description, and this Court's research has not uncovered any.  The Court declines to extend the presumption and considers whether plaintiff has set forth evidence of damages.

Plaintiff argues that defendants caused a decline in sales and injured its reputation among consumers.  Although the Court has ruled that plaintiff may not present expert testimony regarding lost profits, it is undisputed that in early October of 2004, Sunlight determined that "at least 23 known customers" did not buy saunas due to the Hall/Thomas website.  <u>Plaintiff's Response</u> (Doc. #200) at ¶ 182 at 40; <u>see</u> <u>Defendants Joint Reply</u> (Doc. # 212) ¶ 182 at 74 (uncontroverted).  Sunlight specifically identified 16 prospective buyers who did not purchase because of the website and seven prospective buyers which it believed possibly did not purchase because of the website.  Plaintiff has raised a genuine issue of material fact as whether consumers could be confused about the commercial activities of defendants.  Defendant is not entitled to summary

43

judgment on the ground that plaintiff has no evidence of damages.[27]

### 4.      Cybersquatting Under The Lanham Act (Count XVI)

Sunlight claims that defendants used its trade name and mark in the domain name "sunlightsaunas-exposed.com" in violation of the Lanham Act's Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  Defendants argue that they are entitled to summary judgment because such use was a legitimate fair use that could not cause confusion.  The ACPA provides as follows:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>> (ii) registers, traffics in, or uses a domain name that –
>>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).  To establish a cybersquatting claim, plaintiff must show that (1) its marks are distinctive or famous; (2) defendants' domain name is identical or confusingly similar to plaintiff's marks; and (3) defendants registered its domain name in bad faith with the intent to profit from it.  Mayflower Transit, LLC v. Prince, 314 F. Supp.2d 362, 367 (D.N.J. 2004).  Defendants do not contest the first element, but argue that plaintiff cannot show confusing similarity or bad faith.

### a.      Confusing Similarity

Defendants contend that as a matter of law, the domain name "www.sunlightsaunas-exposed.com" was not confusingly similar to plaintiff's mark, SUNLIGHT SAUNAS, because the domain name constituted a clear "anti" message which alerted any user that the website was critical of plaintiff.  Plaintiff

---

[27]      Plaintiff's claims for corrective advertising expenses and wrongfully obtained profits are no longer at issue.

argues that confusing similarity is a quintessential question of fact, not properly determined on summary judgment. Plaintiff also argues that confusion did occur and that defendants even received e-mails which questioned the affiliation between plaintiff and the website. Defendants cite <u>Bally Total Fitness Holding Corp.</u> <u>v. Faber</u>, 29 F. Supp.2d 1161, 1165 n.2 (C.D. Ca. 1998), which noted in dicta that a reasonable user would not believe that Bally sponsored a website called "Ballysucks.com," and concluded that use of a mark as part of a larger domain name would not necessarily violate the ACPA. The court specifically noted that defendant's use of plaintiff's mark occurred "in the context of consumer criticism," that defendant did not actually use the mark in the domain name, and that defendant stated that plaintiff had not authorized the website. <u>Id.</u> at 1165.

In <u>Taubman Co. v. Webfeats</u>, 319 F.3d 770 (6th Cir. 2003), the Sixth Circuit examined use of a plaintiff's mark in a domain name under the Lanham Act. It found "no possibility of confusion" between Taubman and "taubmansucks.com" because inclusion of the term "sucks" removed any confusion as to the source. <u>Id.</u> at 778. In <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d 774 (8th Cir. 2004), the Eighth Circuit examined whether the First Amendment protects the misleading use of plaintiffs' marks in a domain name. There, the Eighth Circuit found that domain names such as drinkcoke.org, mycoca-cola.com, mymcdonalds.com, mypepsi.org and my-washingtonpost.com were likely to confuse the public as to the source and sponsorship of websites and to divert users from their intended online destinations. It also noted that "[t]he right to disseminate criticism on the Internet cannot trump the public's right not to be deceived by a confusingly similar domain name." <u>Id.</u> at 789 (quoting 4 McCarthy § 25:76). In <u>Lucent Technologies, Inc. v. Lucentsucks.com</u>, 95 F. Supp.2d 528 (E.D. Va. 2000), the court commented that "the average consumer would not confuse lucentsucks.com with a web site sponsored by plaintiff [Lucent Technologies]." <u>Id.</u> at 535.

This case presents a closer question than those presented in <u>Bally</u>, <u>Taubman</u> and <u>Lucent</u> because the

45

term "exposed" does not send the same unequivocal negative message as "sucks."  See, e.g., Taubman, 319

F.3d at 778 (addition of qualifying moniker "sucks" to domain name removes confusion as to source); Lucent

Techs., Inc., 95 F. Supp.2d at 535; Bally, 29 F. Supp.2d at 1164 (term "sucks" loaded with criticism).  The

term "exposed" is not necessarily critical.  See Webster's Third New International Dictionary 802 (1993)

("exposed" defined as "open to view" or "not shielded or protected").  Although the term "exposed" may

involve critical treatment of a subject, it may not immediately alert an Internet user that he or she is entering a

"gripe site."  The Court cannot conclude that as a matter of law, confusing similarity is absent.

### b.     Bad Faith

Defendants argue that as a matter of law, plaintiff cannot establish bad faith.

Specifically, defendants contend they did not act in bad faith and that their use of plaintiff's mark constituted

a bona fide noncommercial or fair use, in that they used the website as a "gripe site" for critical commentary

protected by the First Amendment.  For purposes of this motion, the Court has already rejected defendants'

First Amendment argument.  The ACPA lists nine factors which the Court considers in determining whether

defendants acted in bad faith:

> (I)     the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark

46

owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)    the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(4)(B)(i). This list is not exhaustive or mandatory. See Morrison & Foerster, LLP v. Wick, 94 F. Supp.2d 1125, 1131 (D. Colo. 2000). The Court may also consider "unique circumstances . . . which do not fit neatly into the specific factors enumerated by Congress." Sporty's Farm LLC v. Sportsman's Mkt., Inc., 202 F.3d 489, 499 (2d Cir. 2000).

Plaintiff cites the following evidence of bad faith: (1) defendants used Sunlight's entire trade name; (2) defendants linked their websites to the Hall/Thomas website to divert customers; (3) Hall used a fictitious name to set up the website and purposefully used sunlightsaunas@yahoo.com as the e-mail account for sending comments; (4) the website was confusingly similar to plaintiff's website; and (5) defendants' statements in relation to the website reveal their desire to injure plaintiff.

As to the first factor – trademark in the domain name – Sunlight has shown that defendants used its trade name in the website domain name. Plaintiff has established the second factor – that defendants' domain name consists of its own legal name. Defendants do not dispute the third factor – plaintiff's prior use of the name in connection with the bona fide offering of goods or service. Defendants argue that their use of plaintiff's mark was acceptable, however, under the fourth factor – bona fide noncommercial or fair use of the mark in

a site. The Court has previously found that defendants are not entitled to summary judgment on this issue. As to the fifth factor – defendants' intent to divert consumers – plaintiff has set forth evidence from which a jury might conclude that defendants chose the domain name with the intent to disparage the mark and divert customers from plaintiff. Plaintiff has produced no evidence which suggests that defendants tried to transfer, sell or assign the domain name for profit – the sixth factor. Applying the seventh factor – provision of material and misleading false contact information when registering a domain name – plaintiff has evidence that defendants registered the domain name under a fictitious name. Plaintiff has not cited evidence of the eighth factor – registration of multiple domain names which defendants knew were identical or confusingly similar to plaintiff's marks. Finally, the parties do not dispute that plaintiff's mark is distinctive or famous – the ninth factor.

Based on plaintiff's evidence on a number of the factors, a reasonable jury could find that defendants acted in bad faith. Defendants are not entitled to summary judgment on this claim.

## C.    Antitrust Claim (Count XVII)

The Sherman Act, 15 U.S.C. § 1, prohibits restrictive practices which impose unreasonable restraints on competition. See Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977). It provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. Count XVII claims that defendants conspired to restrain trade by organizing a horizontal boycott to induce suppliers and customers not to deal with Sunlight, and that such conduct constitutes a per se violation of 15 U.S.C. § 1. Specifically, plaintiff argues that the elements of a per se horizontal boycott are

48

established by the following facts: (1) Brighton, Sundance and Sauna by Airwall are horizontal competitors in the sauna marketplace; (2) Brighton, Sundance and Sauna by Airwall engaged in coordinated activity to create, maintain and disseminate the website; (3) Brighton, Sundance and Sauna by Airwall did so to deny plaintiff's access to customers. See Plaintiff's Memorandum In Opposition (Doc. #200) at 65. Defendants seek summary judgment, arguing that (1) plaintiff does not demonstrate the relevant market or market power critical to a horizontal boycott; (2) plaintiff has not identified a market, market power or shown conduct which could cause injury to competition; and (3) plaintiff has no evidence which shows that any supplier cut off supplies or refused to deal with it.

To prove that defendants violated the Sherman Act, plaintiff must show that "the conspiracy results in an unreasonable restraint on competition (referred to as the rule of reason), or that the conduct falls into one of the categories of 'per se' illegality." Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1392 (10th Cir. 1992). Group boycotts are often considered per se illegal. Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985). To establish that a group boycott is per se illegal, "there must be an agreement among conspirators whose market positions are horizontal to each other." Coffey, 955 F.2d at 1392 (quoting Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1224 n.1 (10th Cir. 1986)). The Supreme Court has cautioned against the expansion of the group boycott label and imposing per se liability. F.T.C. v. Ind. Antitrust Fed'n of Dentists, 476 U.S. 447, 457-58 (1986).

Plaintiff argues that defendants' horizontal boycott was per se unlawful, in that defendants conspired with other competitors to defame it and disparage its products, and thereby cut off plaintiff's access to customers and suppliers. The Tenth Circuit has discussed the applicability of the per se rule, on which plaintiff relies, as follows:

49

The application of the *per se* rule is reserved for situations where the conduct almost always has an anticompetitive effect and virtually never has a procompetitive effect. If conduct falls into a *per se* category, the conduct is presumed illegal. For example, price-fixing, horizontal divisions of markets, bid rigging, tying arrangements, and horizontal refusals to deal have earned the *per se* label because experience has shown that these arrangements are almost always anticompetitive and rarely have any procompetitive justification. The *per se* analysis applies because the conduct is so certain to unreasonably displace the competitive process that it is presumed illegal.

Diaz v. Farley, 15 F. Supp.2d 1138, 1143-44 (10th Cir. 1998). Plaintiff bears the burden to show that defendants' conduct falls into one of the per se categories, id. at 1144, and the Supreme Court advised a cautious approach in determining whether to apply a per se test in concerted refusals to deal, see Nw. Wholesale Stationers, Inc., 472 U.S. at 294. The Court stated as follows:

Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market.

Id. (citations omitted). Here, plaintiff alleges that defendants have engaged in a concerted refusal to deal. Defendants did not refuse to deal with plaintiff, so the question is whether trying to persuade customers not to deal with plaintiff constitutes a per se violation. Economic injury to competitors is not a per se violation. Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1292 (9th Cir. 1983).

Unless defendant possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion of plaintiff is virtually always likely to have an anticompetitive effect – thereby invoking a per se analysis – is not warranted. Nw. Wholesale Stationers, 472 U.S. at 296; Diaz, 15 F. Supp.2d at 1143-44. A per se analysis may be appropriate where defendants have unique access to a business element necessary for effective competition. Id. at 1148.

50

Market power is the preliminary threshold inquiry and here – as in many antitrust cases – it is dispositive. To prove potential for genuine adverse effects on competition, plaintiff must define the relevant market and establish that defendants possessed market power. Ind. Fed'n of Dentists, 476 U.S. at 460-61. Here, plaintiff has not shown that defendants possessed market power or exclusive access to customers. Plaintiff does not allege the market position of any party or claim that defendants possessed a dominant position in the relevant market. Plaintiff argues that under Diaz, market power is irrelevant because plaintiff only has to show a conspiracy which is not justified by plausible arguments of competition-enhancing effects, i.e. by improving overall efficiency or making markets more competitive. Plaintiff's argument misstates Diaz, and the Court does not find that a per se analysis is proper.

In a rule of reason analysis, the Court must first determine "whether the offending competitor . . . possesses market power in the relevant market where the alleged anti-competitive activity occurs." SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 965 (10th Cir. 1994). Plaintiff has not alleged that it is entitled to recover under rule of reason theory, and it apparently concedes that it cannot prevail on such a claim. The Court therefore finds that as a matter of law, defendant is entitled to summary judgment on plaintiff's antitrust claim (Count XVII).

### D.     Claims Under California Law (Counts XII and XIII)

Plaintiff claims that Sundance violated Cal. Bus. & Prof. Code § 17500 by engaging in false advertising. While the pretrial order is not clear, plaintiff apparently complains that (1) defendants' website contained false statements and (2) Sundance falsely advertised Sunlight products to a private investigator who was posing as a potential customer. Based on the allegedly false advertising, plaintiff also asserts that defendants engaged in unfair business practices in violation of Cal. Bus. & Prof. Code § 17200. Defendants contend that they are

51

entitled to summary judgment because plaintiff has not shown proof of actual injury.

Under Cal. Bus. & Prof. Code § 17500, a corporation may not make or disseminate "in any . . . manner or means whatever, including over the Internet, any statement concerning . . . personal property or services . . . which is untrue or misleading, and which is known . . . to be untrue or misleading." A violation may be punishable by imprisonment or a fine not exceeding $2,500, or by both. A violation of the false advertising law also constitutes a violation of the unfair competition law. Kasky v. Nike, Inc., 27 Cal.4th 939, 949-50, 45 P.3d 243 (2002).

On November 2, 2004, California voters approved Proposition 64, which amended Business and Professions Code Sections 17203 and 17204. For standing to sue for unfair competition or false advertising under the revised law, Section 17204 requires plaintiff to allege that it has "suffered injury in fact and has lost money or property as a result of such unfair competition."

Defendants contend that plaintiff has not shown actual injury. Plaintiff responds to this as "sheer head-in-the-sand mentality," citing documents which list customers who did not purchase saunas from plaintiff because they saw the Hall/Thomas website. As noted earlier, plaintiff has undisputed evidence that certain individuals did not purchase because of the website. Accordingly, the Court finds that defendants are not entitled to summary judgment on this issue.[28]

### E.     Tort Claims Under Kansas Law

#### 1.     Tortious Interference With Contract and Business Expectancy (Counts I

---

[28]     Defendants make two additional arguments: (1) because the website existed for one month and has already been down for more than one year, no imminent threat requires injunctive relief; and (2) plaintiff is not entitled to damages because the claims arise in a context where public policy supports competitive rebuttals to misrepresentations. The Court has already determined that defendants are not entitled to summary judgment, so it need not reach these issues.

**and II)**

Plaintiff claims that defendants interfered with contracts between Sunlight and its customers (Count I) and interfered with potential contracts or prospective business relations with potential customers (Count II). Specifically, plaintiff alleges that defendants gave customers and potential customers false or misleading information about Sunlight, tried to get customers to break existing contracts with plaintiff and encouraged potential customers to purchase elsewhere. Defendants argue that they are entitled to summary judgment because plaintiff cannot show (1) contracts which customers breached, (2) defendants' knowledge of those contracts and prospective customers, (3) malice or lack of justification for their conduct, (4) a causal link between any disparaging statements and plaintiff's injury or (5) special damages.

### a.    Tortious Interference With Contract (Count I)

To recover for tortious interference with contract, plaintiff must show (1) a contract; (2) the wrongdoer's knowledge thereof; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages resulting therefrom. Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, 168-69, 872 P.2d 252, 257 (1994). Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 425, 77 P. 3d 130, 151 (2003) (quoting Turner v. Halliburton Co., 240 Kan. 1, 722 P.2d 1106 (1986)). Where plaintiff alleges interference based on defamatory statements, the communication is subject to a qualified privilege which requires plaintiff to prove actual malice by defendants. Turner, 240 Kan. at 14, 722 P.2d at 1117.

Defendants argue that plaintiff has not demonstrated that any customer breached a contract with plaintiff because of their activities. Plaintiff asserts that is has produced "tens of thousands of pages of documents," including breached contracts, but does not cite record evidence of any particular breached contract. Plaintiff specifically refers to Exhibit 98 as an example of one of its invoices, but that exhibit does not show evidence

of breach or that defendants procured the alleged breach.

Aside from conclusory and self-serving statements, plaintiff has not shown specific evidence of the second and third elements – that defendants knew of any contracts between Sunlight and its customers and that defendants intentionally procured their breaches. Tortious interference requires defendants' knowledge of the contracts. Plaintiff has evidence of lost sales involving some 16 customers, but no evidence that defendants knew about these contracts or deliberately caused customers to breach them. Because plaintiff has not established a genuine issue of material fact with respect to the first three elements, defendants are entitled to summary judgment on plaintiff's claim for tortious interference with contract.

### b.    Tortious Interference With Business Relationships (Count II)

The elements of tortious interference with a prospective business advantage or relationship are (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that except for defendant's conduct, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages as a direct or proximate result of defendant's misconduct. Plaintiff must also show malice:

> Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations.

Id. at 424, 151.

Defendants correctly note that plaintiff has no evidence that it lost any business expectancy. Plaintiff has named some individuals (Diana Harbison, Dan Cabral, Darren Jordan and "Doug" in California) who it

54

believed might have been interested but did not purchase saunas from plaintiff.  See also Exhibit 85 to Plaintiff's Memorandum in Opposition (Doc. #200).  Plaintiff has not shown, however, that defendants had knowledge of these potential purchasers.  Without evidence of this element, plaintiff cannot establish tortious interference with a business expectancy.  Defendants are therefore entitled to summary judgment on this claim.

### 2.    Defamation (Count IV)

Plaintiff claims that defendants defamed it in website statements and oral statements to customers and prospective customers (Count IV).  Defendants argue that they are entitled to summary judgment because (1) their statements were truthful; (2) they did not act outside a qualified privilege or with malice, (3) plaintiff cannot show a causal link between any disparaging statements and its injury; and (3) plaintiff has no evidence of special damages.

In Kansas, the elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed.  Luttrell v. United Tel. Sys., Inc., 9 Kan. App.2d 620, 620-21, 683 P.2d 1292 (1984).  A corporation may be liable for the defamatory utterances of its agent which are made while acting within the scope of his authority.  Id. at 621.  Defendants may assert affirmative defenses, including truth and privilege.  Ali v. Douglas Cable Commc'ns, 929 F. Supp. 1362, 1384 (D. Kan. 1996) (citing Turner, 240 Kan. at 7, 722 P.2d at 1106).  A qualified privilege is restricted to situations where public policy favors free exchange of information over the individual's interest in good reputation.  Id.

### a.    Truthfulness

Defendants first argue that their website statements were truthful.  Plaintiff asserts that the website falsely stated that (1) plaintiff lied about its ceramic heaters, veneer, safety certifications, lifetime warranty and exclusive features; (2) Sunlight heaters "are made from steel rods and aluminum casing with pink

paint;" (3) "Sunlight Saunas would have you believe that each of their saunas were 100% veneer free;" (4) "Sunlight Saunas has no safety compliance" and "No Safety Warnings;" (5) "Sunlight Saunas would have you believe they are the manufacturer, yet another lie;" and (6) "Sunlight Saunas presents a list of 'exclusive' features.  Claiming to be unique. . . .  Sunlight Saunas doesn't even manufacture their own saunas.  Other company's [sic] offer the same products without the fraudulent claims."

As stated in Section I.B.1., <u>supra</u>, plaintiff has raised a genuine issue of material fact whether defendants made defamatory website statements.  Defendants' motion for summary judgment on this ground is therefore overruled.  Defendants do not seek summary judgment on plaintiff's claim that they defamed it in oral statements, so those claims remain for trial.

### b.    Qualified Privilege

Defendants assert a defense of qualified privilege.[29]  The Kansas Supreme Court set forth the essential elements of qualified privilege as "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only."  <u>Knudsen v. Kan. Gas & Elec. Co.</u>, 248 Kan. 469, 480, 807 P.2d 71, 79 (1991).  The Kansas Supreme Court further explained as follows:

> Conditional or qualified privilege is based on public policy. . . .  The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty.  The transmitter must have an interest or duty in the subject matter, and the addressee must have a corresponding interest or duty, but such duty may be moral or social, rather than a legal one.  The defense of qualified privilege does not extend to a publication to the general public.

<u>Id.</u>

---

[29]     Defendants characterize this defense as the competitor's privilege and discuss it in the tortious interference context.

Here, defendants posted their statements on the Internet.  The parties do not discuss whether internet publication constitutes publication to the general public, but the Court concludes that it does.  See, e.g., Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1131 (9th Cir. 2006) (internet publication is form of "aggregate communication" intended for broad public audience similar to print media); Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, (D.C. Cir. 2005) (trade secrets posted on FDA website available to public); Am. Booksellers Found. v. Dean, 342 F.3d 96, 100 (2d Cir. 2003) (when people post information to website available to public, they distribute it).  Under Knudsen, defendants may have an interest in the communication, but they have not shown that the general public has a corresponding interest.  Furthermore, access to the website was not limited or restricted in any way.  Defendants therefore made the statements widely available to the general public, just as if they had published the statements in a print newspaper or magazine.  As a matter of law, defendants cannot assert the defense of qualified privilege on their defamation claim.  Defendants are not entitled to summary judgment on this basis.

### c.     Causal Link Between Website Statements And Plaintiff's Injury

Defendants argue that plaintiff has not established a causal relationship between the website statements and plaintiff's alleged damages.  Citing Hutchinson v. Pfeil, 211 F.3d 515 (10th Cir. 2000), plaintiff maintains that injury can be presumed where defendant makes objectionable statements and is an obvious competitor with respect to the misrepresented product.  Hutchinson, however, is a Lanham Act case which does not apply to plaintiff's common law defamation claim.  In Kansas, damages for defamation may not be presumed but must be established by proof of actual damages.  Gobin v. Globe Pub. Co., 232 Kan. 1, 5, 649 P.2d 1230, 1242 (1982); see also Bosley v. Home Box Office, Inc., 59 F. Supp.2d 1147, 1150 (D. Kan. 1999); Ali, 929 F. Supp. at 1384.

To survive summary judgment on its defamation claim, plaintiff must present evidence that defendants' statements caused identifiable damage to its reputation.  See Gobin, 232 Kan. at 6, 649 P.2d at 1244.  Plaintiff can prove such damage by showing that (1) persons were deterred from associating with it; (2) its reputation has been lowered in the community; or (3) its profession suffered.  See Ali, 929 F. Supp. at 1385.  Damage to reputation can be inferred from the evidence so long as the inference is reasonable.  Moran v. State, 267 Kan. 583, 590, 985 P.2d 127, 133 (1999).  An inference of damage to reputation can be inferred from lost sales, and is a question of fact for the jury.  Therefore, plaintiff has demonstrated a genuine issue of material fact with regard to damages and defendants are not entitled to summary judgment on plaintiff's defamation claim.

### 3.        Injurious Falsehood (Count VI)

Plaintiff claims that defendants communicated injurious falsehoods about its products to third parties by posting false information on the website.  Defendants claim that they are entitled to summary judgment because (1) their statements were true, (2) their statements were privileged and (3) plaintiff has not shown a causal link between any disparaging statements and any injury or special damages.  Defendants also note that Kansas has not recognized the tort of business disparagement.

An action for injurious falsehood generally applies to cases of disparagement of property in land, chattels or intangible things or of their quality.  Restatement (Second) of Torts § 623A.  The tort protects the economic interests of the injured party against pecuniary loss.  Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766 (Tex. 1987).  The tort of injurious falsehood has also been called "commercial disparagement," "product disparagement," "trade libel," "disparagement of property" and "slander of goods."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:99 (4th ed. 2005).

The Court's research has not uncovered any Kansas cases which involved a cause of action for

injurious falsehood. In <u>St. Catherine Hospital of Garden City v. Rodriguez</u>, 25 Kan. App.2d 763, 971 P.2d 754 (Kan. App. 1998), however, the Kansas Court of Appeals refused to recognize the tort of business disparagement. It acknowledged that other states have recognized such a tort, but it expressly declined to "create a new tort in the state of Kansas." <u>Id.</u> Based on <u>St. Catherine</u>, this Court believes that Kansas courts would not recognize the tort of injurious falsehood. Accordingly, defendants are entitled to summary judgment on this claim.

### 4. Prima Facie Tort (Count IX)

Count IX vaguely claims that defendants engaged in "otherwise lawful acts without justification in a willful and intentional manner to injure [plaintiff]." <u>Pretrial Order</u> (Doc. #187) at 17. From this broad statement, the Court cannot discern the factual basis for plaintiff's claim, or what injurious lawful acts are at issue. Defendants argue that they are entitled to summary judgment because Kansas does not recognize a claim for prima facie tort. Defendants rely on <u>Mid Gulf, Inc. v. Bishop</u>, 792 F. Supp. 1205, 1216 n.2 (D. Kan. 1992), which states,

> The term "prima facie tort" has appeared rarely in Kansas opinions and then only as part of a laundry list of theories of liability asserted by one of the parties. No published Kansas opinion to date has directly recognized the theory of prima facie tort.

Plaintiff does not cite any Kansas cases which recognize a separate cause of action for prima facie tort, or otherwise respond to defendants' motion for summary judgment on Count IX. The Court therefore grants summary judgment for defendants on this claim.

### 5. Civil Conspiracy Claims (Counts VII and VIII)

According to the pretrial order, plaintiff's civil conspiracy claim – stated in its entirety – is that "[d]efendants conspired among themselves and with others to injure Sunlight Saunas." <u>Pretrial Order</u>

(Doc. #187) at 17.  Based on plaintiff's allegations in the third amended complaint (Doc. #147), the Court considers Count VII as a claim for civil conspiracy by Sundance, Brighton, Sauna by Airwall and Soft Heat to defame Sunlight and disparage its products and Count VIII as a claim for civil conspiracy by Sundance and Brighton to create a website to defame Sunlight and disparage its products.  Defendants argue that they are entitled to summary judgment because plaintiff cannot establish any underlying tort or damages.

To establish a civil conspiracy, plaintiff must show (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.  Meyer Land & Cattle Co. v. Lincoln County Conservation Dist., 29 Kan. App.2d 746, 753, 31 P.3d 907, 977 (2001).  A civil conspiracy is not actionable under Kansas law without commission of some wrong giving rise to a tortious cause of action independent of conspiracy. Stoldt v. City of Toronto, 234 Kan. 957, 678 P.2d 153, 161 (1984).

Plaintiff argues that all elements of civil conspiracy are established: (1)  Sundance, Brighton, Soft Heat, Sauna by Airwall and Cobalt Multimedia banded together; (2) with intent to injure or dissolve plaintiff; (3) by providing competitive analyses, information and images for a website to disparage plaintiff.  Defendants deny that Sauna by Airwall and Soft Heat were involved in any conspiracy, and argue that plaintiff cannot prove overt acts or damages.  The Court disagrees in part.  As to overt acts,  plaintiff has raised a genuine issue of material fact whether defendants posted defamatory materials on their website.  As to damages, plaintiff has also cited some evidence of damages.  The Court therefore overrules defendants' motion for summary judgment on plaintiff's claims for civil conspiracy based on defamation (Count VII and VIII).

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment (Doc. #188) filed January 20, 2006 be and hereby is **SUSTAINED in part** and **OVERRULED in part**.  The Court

**OVERRULES** defendants' motions as to Counts III (common law trademark infringement, dilution and unfair competition), IV (defamation), VII (civil conspiracy), VIII (civil conspiracy), XII (unfair business practices under California law), XIII (false advertising under California law), XIV (false advertising under the Lanham Act), XV (false description under the Lanham Act) and XVI (cybersquatting).  These counts remain for trial. The Court **GRANTS** summary judgment in favor of defendants as to Counts I (tortious interference with contract), II (tortious interference with prospective business relationship), VI (injurious falsehood), IX (prima facie tort) and XVII (antitrust violation).[30]

  **IT IS FURTHERED ORDERED** that <u>Defendant Brighton's Motion For Summary Judgment</u> (Doc. #194) filed January 20, 2006 be and hereby is **OVERRULED**.

  Dated this 17th day of April, 2006 at Kansas City, Kansas.

           <u>s/  Kathryn H. Vratil</u>
           Kathryn H. Vratil
           United States District Judge

---

[30]  Plaintiff abandoned Counts V (negligent defamation), X (wrongful appropriation) and XI (defamation under California law) in the pretrial order.

61